1   Laurie Edelstein (Bar No. 164466)
    Paige Zielinski (Bar No. 318639)
2   JENNER & BLOCK LLP
    455 Market Street, Suite 2100
3   San Francisco, California 94105
    Telephone:   (628) 267-6800
4   Facsimile:    (628) 267-6859
    ledelstein@jenner.com
5   pzielinski@jenner.com

6   John Flynn (Bar No. 196294)
    JENNER & BLOCK LLP
7   1099 New York Avenue, NW, Suite 900
    Washington, DC 20001
8   Telephone:   (202) 639-6000
    Facsimile:    (202) 639-6066
9   jflynn@jenner.com

10  *Attorneys for Defendant Meta Platforms, Inc.*

11

12              **UNITED STATES DISTRICT COURT**

13            **NORTHERN DISTRICT OF CALIFORNIA**

14                 **SAN FRANCISCO DIVISION**

15

16  JUSTIN WALKER, on behalf of himself and all          )   Case No. 3:22-cv-02442 SK
    others similarly situated,                           )
17                                                       )   **DEFENDANT META PLATFORMS,**
                                                         )   **INC.'S NOTICE OF MOTION AND**
                         Plaintiff,                      )   **MOTION TO DISMISS CLASS**
18                                                       )   **ACTION COMPLAINT**
             v.                                          )
19                                                       )
    META PLATFORMS, INC.,                                )   Judge:  The Honorable Sallie Kim
20                                                       )   Hearing Date:  August 8, 2022
                         Defendant.                      )   Time:  9:30 a.m.
21                                                       )   Place:  Courtroom C—15th Floor
                                                         )
22                                                       )   Action filed: March 17, 2022
                                                         )
23  _____              )

24

25

26

27

28

JENNER & BLOCK LLP
455 Market Street, Suite 2100
San Francisco, CA 94105

**NOTICE OF MOTION AND MOTION**

**TO THE COURT, PLAINTIFF, AND HIS ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on August 8, 2022 at 9:30 a.m. or as soon thereafter as this matter may be heard before the Honorable Sallie Kim in Courtroom C on the 15th floor of the United States District Court for the Northern District of California, Phillip Burton Federal Building and United States Courthouse, 450 Golden Gate Avenue, San Francisco, California 94102, Defendant Meta Platforms, Inc. ("Meta") will and hereby does respectfully move to dismiss the Class Action Complaint ("Complaint") filed by Plaintiff Justin Walker ("Plaintiff") with prejudice.

Meta moves to dismiss Plaintiff's Complaint on the basis that Plaintiff fails to state a claim under the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710, because the conduct alleged in the Complaint is not a violation of the VPPA as a matter of law.

This motion is brought pursuant to Federal Rule of Civil Procedure 12(b)(6) and is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, Meta's Request for Judicial Notice, the pleadings on file in this matter, and on the oral arguments of counsel and other matters properly considered by the Court at the hearing on the motion.

Dated: May 20, 2022

Respectfully submitted,

JENNER & BLOCK LLP

By: */s/ Laurie Edelstein*
        Laurie Edelstein

*Attorneys for Defendant Meta Platforms, Inc.*

JENNER & BLOCK LLP
455 Market Street, Suite 2100
San Francisco, CA 94105

1

**TABLE OF CONTENTS**

MEMORANDUM OF POINTS AND AUTHORITIES ........................................................ 1

INTRODUCTION ............................................................................................................. 1

STATEMENT OF ISSUES TO BE DECIDED ................................................................. 2

BACKGROUND ............................................................................................................... 2

      A.     Facebook and Facebook Live ................................................................ 2

      B.     The VPPA ............................................................................................. 5

LEGAL STANDARD ........................................................................................................ 6

ARGUMENT ..................................................................................................................... 7

I.     THE VPPA DOES NOT APPLY TO THE LIVE VIDEO CONTENT ON
      FACEBOOK LIVE ................................................................................................ 7

II.    THE VPPA DOES NOT APPLY HERE BECAUSE FACEBOOK IS AN
      INTERACTIVE COMPUTER SERVICE AND DOES NOT RENT, SELL, OR
      DELIVER THE VIDEO CONTENT ON FACEBOOK LIVE. ........................... 11

CONCLUSION ................................................................................................................ 15

**JENNER & BLOCK LLP**
455 Market Street, Suite 2100
San Francisco, CA 94105

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

## Cases

4

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)..................................................................................6, 7

5

*Austin-Spearman v. AMC Network Entertainment, LLC,*
    98 F. Supp. 3d 662 (S.D.N.Y. 2015)...................................................9

6

*Ayes v. U.S. Dep't of Veterans Affairs,*
    473 F.3d 104 (4th Cir. 2006) ...........................................................8, 9

7

8

*Barnes v. Yahoo!, Inc.,*
    570 F.3d 1096 (9th Cir. 2009) .........................................................13

9

*Cappello v. Walmart, Inc.,*
    No. 18-cv-06678, 2019 WL 11687705 (N.D. Cal. Apr. 5, 2019)...........................11

10

11

*Caraccioli v. Facebook, Inc.,*
    167 F. Supp. 3d 1056 (N.D. Cal. 2016),
    *aff'd,* 700 F. App'x 588 (9th Cir. 2017)...........................................13

12

13

*Daniel v. Cantrell,*
    375 F.3d 377, 382–84 (6th Cir. 2004) ...............................................9

14

*Dyroff v. Ultimate Software Grp., Inc.,*
    934 F.3d 1093 (9th Cir. 2019) .........................................................13

15

16

*Eichenberger v. ESPN, Inc.,*
    876 F.3d 979 (9th Cir. 2017) ..........................................................12

17

*In re Facebook, Inc., Consumer Privacy User Profile Litigation,*
    402 F. Supp. 3d 767 (N.D. Cal. 2019)................................................14

18

19

*Fed. Agency of News LLC v. Facebook, Inc.,*
    395 F. Supp. 3d 1295 (N.D. Cal. 2019)..............................................13

20

*Force v. Facebook, Inc.,*
    934 F.3d 53 (2d Cir. 2019)..............................................................4

21

22

*Gonzalez v. Google LLC,*
    2 F.4th 871 (9th Cir. 2021), *petition for cert. filed,* 90
    U.S.L.W. 3325 (U.S. Apr. 6, 2022) (No. 21-1333) ..............................4, 13

23

24

*In re Hulu Priv. Litig.,*
    No. C 11-03764, 2014 WL 1724344 (N.D. Cal. Apr. 28, 2014) ...............14

25

26

*In re Hulu Privacy Litig.,*
    No. C 11-03764, 2012 WL 3282960 (N.D. Cal. Aug. 10, 2012)...............8, 9, 11

27

28

**JENNER & BLOCK LLP**
455 Market Street, Suite 2100
San Francisco, CA 94105

*Igbonwa v. Facebook, Inc.*,
   No. 18-CV-02027, 2018 WL 4907632 (N.D. Cal. Oct. 9, 2018),
   *aff'd*, 786 F. App'x 104 (9th Cir. 2019)...................................................................13

*Katz v. United States*,
   389 U.S. 347 (1967)...........................................................................................10

*Klayman v. Zuckerberg*,
   753 F.3d 1354 (D.C. Cir. 2014) ..........................................................................13

*Lemmon v. Snap, Inc.*,
   995 F.3d 1085 (9th Cir. 2021) ............................................................................13

*Mollett v. Netflix Inc.*,
   No. 11-CV-01629, 2012 WL 3731542 (N.D. Cal. Aug. 17, 2012),
   *aff'd*, 795 F.3d 1062 (9th Cir. 2015)..................................................................11

*Obasi Inv. LTD v. Tibet Pharms., Inc.*,
   931 F.3d 179 (3d Cir. 2019)..............................................................................8, 9

*Robinson v. Disney Online*,
   152 F. Supp. 3d 176 (S.D.N.Y. 2015).................................................................14

*Rodriguez v. Sony Computer Entertainment America, LLC*,
   801 F.3d 1049 (9th Cir. 2015). ...........................................................................12

*Rousey v. Jacoway*,
   544 U.S. 320 (2005) .............................................................................................8

*Sikhs for Justice "SFJ", Inc. v. Facebook, Inc.*,
   144 F. Supp. 3d 1088 (N.D. Cal. 2015), *aff'd*, 697 F. App'x 526
   (9th Cir. 2017)...................................................................................................13

*Sterk v. Redbox Automated Retail, LLC*,
   No. 11 C 1729, 2012 WL 3006674 (N.D. Ill. July 23, 2012). ..............................10

*TRW Inc. v. Andrews*,
   534 U.S. 19 (2001)...............................................................................................9

*United States v. Komada & Co.*,
   162 F. 465 (9th Cir. 1908) ....................................................................................8

*United States v. Mitchell*,
   941 F.2d 690 (8th Cir. 1991) ................................................................................8

*United States v. Norris*,
   942 F.3d 902 (9th Cir. 2019) ..............................................................................10

*United States v. Perez de Dios*,
   237 F.3d 1192 (10th Cir. 2001) ............................................................................8

*In re Vizio, Inc., Consumer Priv. Litig.*,
   238 F. Supp. 3d 1204 (C.D. Cal. 2017) ......................................................8, 11, 12

JENNER & BLOCK LLP
455 Market Street, Suite 2100
San Francisco, CA 94105

# Statutes

11 U.S.C. § 525(a) ...........................................................................................9

18 U.S.C.
  § 2710(a)(3) ...............................................................................................5
  § 2710(a)(3), (b) ........................................................................................6
  § 2710(a)(4) ................................................................................1, 5, 7, 11
  § 2710(b) ....................................................................................................5
  § 2710(b)(1) ...............................................................................................7

47 U.S.C.
  § 230(a)(3) ...............................................................................................13
  § 230(f)(2) ................................................................................................12

Video Privacy Protection Act Amendments Act of 2012, Pub. L. No. 112-258,
  126 Stat. 2414 (2013).................................................................................6

# Legislative History

134 Cong. Rec. 31070 (1988) .............................................................................6

158 Cong. Rec. 17304 (2012) .............................................................................6

S. Rep. No. 100-599 (1988), *as reprinted in* 1988 U.S.C.C.A.N. 4342-1 ......................5, 8, 10, 12

S. Rep. No. 112-258 (2012)........................................................................6, 15

# Court Rules

Federal Rule of Civil Procedure 12(b)(6) ................................................2, 1, 6, 15

# Other Authorities

Merriam-Webster Dictionary, https://www.merriam-
  webster.com/dictionary/similar (May 6, 2022)....................................7, 8

Oxford English Online Dictionary..........................................................................7

Webster's Third New Int'l Dictionary (1986) ......................................................7

JENNER & BLOCK LLP
455 Market Street, Suite 2100
San Francisco, CA 94105

JENNER & BLOCK LLP
455 Market Street, Suite 2100
San Francisco, CA 94105

**MEMORANDUM OF POINTS AND AUTHORITIES**

**INTRODUCTION**

Facebook Live is a tool available on Facebook that allows its users to make personal connections and create shared experiences by broadcasting live events in real time to friends, family, and other users anywhere in the world.  Plaintiff Justin Walker claims that Meta has violated the Video Privacy Protection Act ("VPPA") by allegedly disclosing users' personally identifiable information without their consent through Facebook Live.  Specifically, Plaintiff complains that when he attends Facebook Live events shared with him by his Facebook friends, his name is visible to that friend and his other Facebook friends who are attending the same event.

Plaintiff is wrong that these allegations—concerning live broadcasts that users share with each other—can constitute a violation of the VPPA.  Plaintiff's Complaint ignores the plain language of the VPPA and Congress's intent in enacting it.  Accordingly, this case should be dismissed under Federal Rule of Civil Procedure 12(b)(6) for two independent but related reasons:

*First*, Facebook Live, as the name suggests, broadcasts *live* events, which plainly are outside of the scope of the VPPA, which covers *prerecorded* material.  The VPPA governs "video tape service provider[s]," defined as those who engage in the rental, sale, or delivery of "*prerecorded* video cassette tapes or *similar* audio visual materials."  18 U.S.C. § 2710(a)(4) (emphasis added).  Because a live broadcast is the opposite of a prerecorded video cassette tape, Meta does not qualify as a video tape service provider under the VPPA in connection with the Facebook Live product.  This is fatal to Plaintiff's sole claim.  The Court does not need to proceed any further and may dismiss the Complaint on this basis alone.

*Second*, and relatedly, Meta does not engage in the "rental, sale, or delivery" of prerecorded video cassette tapes or similar materials when users broadcast live events through the Facebook Live product.  As an online service, Facebook Live is fundamentally different from the types of services courts have found to be covered by the VPPA.  Modern-day successors to video stores, like Hulu and Netflix, select and obtain rights to a curated inventory of prerecorded videos they provide to customers.  By contrast, Facebook Live allows *users* to share *their own* live user-generated broadcasts to connect and communicate with other Facebook users, just as they would

share pictures or status updates.  Meta thus is not a video tape service provider under the VPPA in connection with the Facebook Live product.

Because no amendment can cure these defects, Plaintiff's Complaint should be dismissed with prejudice.

**STATEMENT OF ISSUES TO BE DECIDED**

1.     Has Plaintiff failed to state a claim under the VPPA given that the VPPA applies only to prerecorded video content and Plaintiff's allegations arise from live broadcasts shared by users with other users through Facebook Live?

2.     Has Plaintiff failed to state a claim under the VPPA given that Facebook is an interactive computer service that allows users to create and share their own live broadcasts through Facebook Live and Meta therefore does not qualify as a "video tape service provider" under the VPPA in connection with Facebook Live?

**BACKGROUND**

**A.     Facebook and Facebook Live**

Facebook is a well-known online social media and social networking service.  *See* Compl. ¶ 16.  Registered Facebook users have access to many tools that allow them to connect and interact with other registered users on the platform.  *See id.* ¶ 24.  One of Facebook's offerings is Facebook Live, which allows Facebook users to create and stream live broadcasts of themselves, others, or their surroundings to friends, family, and other users anywhere in the world.  *See id.* ¶ 28.  Users can "go live" to a designated audience by selecting the Facebook Live icon on the Facebook application's homepage.  Users in the designated audience who choose to watch or tune into the live event can decide whether to be a passive viewer or to comment, "wave," donate to a cause, or otherwise interact with the host and/or with other viewers.  The "eye" icon (in the upper lefthand corner of the screenshot below)[1] shows the number of viewers watching the live event:

---

[1]  *See* Meta's Request for Judicial Notice ("RJN"), Ex. 1 (screenshot from webpage https://www.facebook.com/formedia/tools/facebook-live).

JENNER & BLOCK LLP
455 Market Street, Suite 2100
San Francisco, CA 94105

JENNER & BLOCK LLP
455 Market Street, Suite 2100
San Francisco, CA 94105



*See also id.* ¶ 30.

Before or even while the host is "live," the host can utilize Facebook Live's privacy features to control her livestream, for instance, by limiting those who can comment or chat:[2]



---

[2] *See* Meta's RJN, Ex. 2 (screenshot from webpage https://www.facebook.com/formedia/tools/facebook-live).

Live broadcasts or "live events" are "held for various purposes and cover an endless number of topics[.]"  *Id*. ¶ 27.  They can consist of "conversation[s], performance[s] . . . or virtual event[s]."  *Id*. ¶ 26 (alterations in original).  A Facebook user who enjoys working out, for instance, could go live from the gym and livestream her workout routine to her friends, who can, in turn, comment and ask questions in real time.  Or a Facebook user who lives in a popular tourist destination such as Rome could livestream a walk through the city while fielding real-time questions from the "live" audience about recommendations for tours or dinner reservations.

To broadcast or attend a Facebook Live event, one must be a registered Facebook user, *i.e.*, have a Facebook account.  *See id*. ¶¶ 18–25.  To create a Facebook account, a would-be user provides a full name and other information and then is able to create a Facebook "profile" and utilize the Facebook Live tool available on the platform.  *Id*. ¶¶ 18, 24, 25.  A user also must agree to Facebook's terms of service to register and create an account.  *See id*. ¶ 18 (screenshot of Sign Up page stating:  "By clicking Sign Up, you agree to our Terms, Data Policy and Cookies Policy.").  Meta's Data Policy and other publicly available information on Facebook's website set forth extensive disclosures about information that always is treated as public.  *See* Meta's RJN, Ex. 3 (Facebook webpage, "What is public information on Facebook?) and Ex. 4 (Meta's Data Policy).  Nonetheless, Plaintiff alleges that when a registered Facebook user attends another user's live event, the user-viewer's user name is displayed to their Facebook friends attending the same event, which allows them to know that the Facebook user is in attendance.  *Id*. ¶¶ 29–31.

When Facebook users post content or update their status, their user names are disclosed and displayed, just as they are on online services, social media platforms, and interactive websites generally.[3]  When a Facebook user likes another user's post, other users can see they have done so.  Likewise, a user's friends can see when they are attending the same Facebook Live event.  Plaintiff nevertheless claims Meta does not disclose it will share users' names—which Plaintiff

---

[3] *See Force v. Facebook, Inc.*, 934 F.3d 53, 66 (2d Cir. 2019) (websites "have always decided . . . where on their sites . . . particular third-party content should reside and to whom it should be shown"); *Gonzalez v. Google LLC*, 2 F.4th 871, 886 (9th Cir. 2021) (quoting *Force* for the same proposition), *petition for cert. filed*, 90 U.S.L.W. 3325 (U.S. Apr. 6, 2022) (No. 21-1333).

JENNER & BLOCK LLP
455 Market Street, Suite 2100
San Francisco, CA 94105

alleges constitutes personally identifiable information ("PII")—when they use the Facebook Live tool and users are not asked to consent to the sharing of this information.  *Id*. ¶¶ 22, 35.

Plaintiff alleges he has been a registered Facebook user for fifteen years and has used Facebook Live since approximately 2017.  *See id*. ¶¶ 36, 37.  Plaintiff further alleges he never gave Facebook consent to make his name visible to his Facebook friends during Facebook Live events.  *Id*. ¶ 39.  But he does not allege any specific instance in which his name or other PII was actually disclosed in connection with his attendance at a live event.  In addition, Plaintiff continued to attend live events three to five times a week for five years.  *See id*. ¶ 38.

**B.**     **The VPPA**

Congress enacted the VPPA in 1988 after a local Washington newspaper published a list of movies Judge Robert H. Bork and his family had rented from a local Potomac Video store while he was being considered for the United States Supreme Court.  *See* S. Rep. No. 100-599, at 5 (1988), *as reprinted in* 1988 U.S.C.C.A.N. 4342-1, 4342-5.  Although the disclosure did not reveal anything particularly noteworthy, the realization that reporters could access a video store's rental records caught the attention of members of Congress, which moved quickly to put that information off limits.  Consistent with the circumstances that motivated its passage, Congress's intent in enacting the VPPA was to "preserve personal privacy with respect to the rental, purchase, or delivery of video tapes or similar audio visual materials."  *See* S. Rep. No. 100-599, at 1, *as reprinted in* 1988 U.S.C.C.A.N. at 4342-1.

The VPPA prohibits a "video tape service provider" from knowingly disclosing its subscribers' PII without consent.  18 U.S.C. § 2710(b).  The statute defines "video tape service provider" as "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of *prerecorded* video cassette tapes or similar audio visual materials."  18 U.S.C. § 2710(a)(4) (emphasis added).  Under the VPPA, PII "includes information which identifies a person as having requested or obtained specific video materials."  18 U.S.C. § 2710(a)(3).[4]

---

[4] Under the VPPA, the title of a video that is watched is not PII unless it is tied to information that allows identification of the viewer.  *See* 18 U.S.C. § 2710(a)(3).

JENNER & BLOCK LLP
455 Market Street, Suite 2100
San Francisco, CA 94105

1    The VPPA's scope is limited.  Indeed, at the time the VPPA was passed, Senator Chuck

2  Grassley observed that the VPPA would add privacy protection "*in a narrow area*."  134 Cong.

3  Rec. 31070 (1988) (statement of Sen. Grassley) (emphasis added).  Similarly, Senator Paul Simon

4  commented, "The Video Privacy Protection Act takes an important step in ensuring that

5  individuals will maintain control over their personal information *when renting or purchasing a*

6  *movie*."  *Id.* at 31069 (statement of Sen. Paul Simon) (emphasis added).

7    In 2013, thirty-five years after passing the VPPA, Congress amended the statute to ensure

8  it was "updated to reflect the realities of the 21st century."  158 Cong. Rec. 17304 (2012)

9  (statement of Rep. Bob Goodlatte); *see generally*, Video Privacy Protection Act Amendments Act

10  of 2012, Pub. L. No. 112-258, 126 Stat. 2414 (2013).  Specifically, Congress added an exception

11  to the general non-disclosure rule to allow videotape service providers to disclose PII to third

12  parties if the consumer provides informed, written consent, including through an electronic means

13  using the internet, in a distinct and separate form.  Pub. L. No. 112-258, 126 Stat. 2414.

14    In modernizing the statute, however, Congress did not broaden or otherwise change the

15  definition of "video tape service provider," despite the proliferation of online services by that time.

16  *See* S. Rep. No. 112-258, at 2 (2012) (recognizing that "[t]oday, many Americans post their

17  opinions and recommendations on social networking sites, like Facebook and Twitter.").  The

18  VPPA's application thus continues to be limited to providers of "prerecorded video cassette tapes"

19  or "similar audio visual materials" that knowingly disclose, without consent, PII that allows

20  identification of the viewer of those materials.[5]  *See* 18 U.S.C. § 2710(a)(3), (b).

21                              **LEGAL STANDARD**

22    A complaint must be dismissed where the plaintiff fails to allege sufficient facts to state a

23  claim upon which relief can be granted.  *See* Fed. R. Civ. P. 12(b)(6).  Mere "labels and

24  conclusions" are insufficient to state a claim for relief, nor will a "formulaic recitation of the

25  elements" suffice.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*,

26  550 U.S. 544, 555 (2007)).  Instead, a plaintiff must "plead[] factual content that allows the court

27

28  [5] Not all prerecorded content necessarily is covered under the VPPA.  However, the Court need
not reach this question because the live nature of the broadcasts here removes any doubt.

JENNER & BLOCK LLP
455 Market Street, Suite 2100
San Francisco, CA 94105

to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

**ARGUMENT**

## I. THE VPPA DOES NOT APPLY TO THE LIVE VIDEO CONTENT ON FACEBOOK LIVE

Plaintiff's case boils down to the claim that Meta has violated the VPPA because his Facebook profile name is visible to his friends when they attend the same Facebook Live event as he does. Compl. ¶¶ 30–35. The VPPA provides that "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider shall be liable to the aggrieved person," subject to certain exceptions. 18 U.S.C. § 2710(b)(1). To state a claim against Meta under the VPPA, Plaintiff thus must adequately allege that (1) Meta is a "video tape service provider" and that Meta (2) knowingly disclosed (3) Plaintiff's personally identifiable information (4) to another person (5) in a manner that is not authorized under the VPPA. *See id.* §§ 2710(a)(4), (b)(1)–(b)(2).

Plaintiff's claim fails at the first step because by its plain terms, the VPPA does not apply to live video content: it applies only to "*prerecorded* video cassette tapes or *similar* audio visual materials." *Id.* § 2710(a)(4) (emphasis added). Plaintiff's claim is limited entirely to disclosures allegedly made about his attendance at Facebook Live events during those very same events. *See* Compl. ¶¶ 30, 31, 38, 39. Plaintiff specifically alleges and acknowledges that Facebook Live events take the form of "live video." Compl. ¶¶ 30, 31. These live and interactive events on Facebook Live are not "prerecorded videocassette tapes."

They also are not "similar" to prerecorded videocassette tapes. Live, interactive video content and prerecorded video cassette tapes are not "very much alike" or "alike in substance or essentials" to prerecorded video cassette tapes.[6] Webster's Third New Int'l Dictionary at 2120

---

[6] The Oxford English Online Dictionary likewise defines "similar" as "having a significant or notable resemblance or likeness, in appearance, form, character, quantity, etc., to something stated or implied (though generally without being identical); of a like nature or kind. Of two or more persons or things: resembling or like one another." *Similar*, Oxford English Dictionary (3d ed. 2019). The Merriam-Webster Online Dictionary defines "similar" as "having characteristics in

JENNER & BLOCK LLP
455 Market Street, Suite 2100
San Francisco, CA 94105

JENNER & BLOCK LLP
455 Market Street, Suite 2100
San Francisco, CA 94105

1   (1986).[7]  In fact, Facebook Live events are the exact *opposite* of "prerecorded" videos and in fact,

2   are mutually exclusive:  an event that is live is not prerecorded; an event that is prerecorded is not

3   live.  Facebook Live events are akin to live concerts or in-person gatherings with friends, only

4   mediated by an online video connection.  *See* Compl. ¶ 26; *supra* pp. 2–5 (Background).

5        The VPPA's legislative history confirms that the phrase "similar audio visual materials" in

6   the VPPA is limited to *prerecorded* video content—not live video content.  In the Senate Report

7   accompanying the VPPA, Congress explained that "similar audio visual materials" refers to

8   materials "such as laser discs, open-reel movies, or CDI technology."  S. Rep. No. 100-599, at 12,

9   *as reprinted in* 1988 U.S.C.C.A.N. at 4342-10.[8]  These enumerated items all are physical media

10  for storing prerecorded video content.  There is no mention of live video content.  Congress easily

11  could have drafted the VPPA to cover live video content, either as part of the original 1988 bill or

12  Congress's 2013 amendment to the VPPA.  Yet, it chose not to do so.

13       Relying on this legislative history, courts in the Ninth Circuit have confirmed that although

14  the VPPA is not strictly limited to video cassette tapes, the phrase "similar audio visual materials"

15  was "designed to include new technologies for *pre-recorded* video content."  *In re Hulu Priv.*

16  *Litig.*, No. C 11–03764, 2012 WL 3282960, at *4–6 (N.D. Cal. Aug. 10, 2012) (emphasis added)

17  (internal quotations and citation omitted); *In re Vizio, Inc., Consumer Priv. Litig.*, 238 F. Supp. 3d

18

19

20  common: strictly comparable."  *Similar*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/similar (May 6, 2022).

21  [7] Courts, including the Ninth Circuit, have consistently applied this definition of "similar" when
22  interpreting provisions of federal law.  *See, e.g., Rousey v. Jacoway*, 544 U.S. 320, 329 (2005)
    ("like, though not identical to" and "shar[ing] characteristics"); *United States v. Komada & Co.*,
23  162 F. 465, 468–69 (9th Cir. 1908) (holding that the ordinary meaning of "similar" is "[n]early
    corresponding; resembling in many respects; somewhat alike; having a general likeness") (quoting
24  Webster's Dictionary), *aff'd*, 215 U.S. 392 (1910); *Obasi Inv. LTD v. Tibet Pharms., Inc.*, 931
    F.3d 179, 186–88 (3d Cir. 2019) ("[h]aving a marked resemblance or likeness; of a like nature or
25  kind") (quoting *Similar*, Oxford English Dictionary 59 (1st ed. 1933); *Ayes v. U.S. Dep't of
    Veterans Affairs*, 473 F.3d 104, 108–09 (4th Cir. 2006) (grants "similar" to "licenses, permits,
26  charters, [and] franchises" covers "only grants bearing a family resemblance"); *United States v.
    Perez de Dios*, 237 F.3d 1192, 1198 (10th Cir. 2001) ("[n]early corresponding; resembling in many
27  respects; somewhat alike; having a general likeness") (internal quotations and citation omitted);
    *United States v. Mitchell*, 941 F.2d 690, 691–92 (8th Cir. 1991) (same).

28  [8] "CDI" appears to refer to the "Compact Disc-Interactive" storage format developed by Philips
    and Sony in the 1980s as an improvement to CD-ROM technology.

1204, 1221 (C.D. Cal. 2017) (citing *Hulu* with approval).  Thus, courts have similarly understood

that the VPPA is limited to prerecorded video.  *See Hulu*, 2012 WL 3282960, at \*4–6.

This conclusion stands to reason.  For instance, in *Ayes v. U.S. Department of Veterans Affairs*, the Fourth Circuit held that a home loan guaranty was not a "license, permit, charter, franchise, or other similar grant" under the Bankruptcy Code, 11 U.S.C. § 525(a).  473 F.3d at 104, 107–09 (4th Cir. 2006).  The Fourth Circuit reasoned the use of the word "similar" in the statute "limits the universe of 'grants' to which § 525(a) applies," ensuring the statute applies only to "grants bearing a family resemblance to licenses, permits, charters, and franchises."  *Id.* at 108.  A home loan guaranty is not "similar" to these other grants, the Fourth Circuit explained, because a loan guaranty is not a "governmental authorization[] that typically permit[s] an individual to pursue some occupation or endeavor aimed at economic betterment."  *Id.*; *see also Obasi Inv. LTD*, 931 F.3d at 186–88 (holding the functions of non-voting board observers are not "similar" to the functions of board directors for the purposes of Section 11 of the Securities Act, 15 U.S.C. § 77k).

The plain language of the VPPA, the legislative history, and principles of statutory interpretation compel the conclusion that "similar audio visual materials" refers to prerecorded video.  Any other interpretation of the VPPA would violate a cardinal rule of statutory interpretation by rendering the word "prerecorded" superfluous.  *See, e.g.*, *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.") (internal quotations and citation omitted).

Courts consistently have rejected expansive interpretations of the VPPA that would render key terms superfluous and maintained the statute's narrow focus.  For instance, in *Daniel v. Cantrell*, the Sixth Circuit declined to apply the VPPA to any person (rather than just to video tape service providers) because such an interpretation would render several parts of the statutory text superfluous.  375 F.3d 377, 382–84 (6th Cir. 2004).  In *Austin-Spearman v. AMC Network Entertainment, LLC*, the Southern District of New York rejected the argument that the VPPA applies to non-subscribers because it would render superfluous the statute's definition of "consumer," which is limited to a renter, purchaser, or subscriber.  98 F. Supp. 3d 662, 670–71

JENNER & BLOCK LLP
455 Market Street, Suite 2100
San Francisco, CA 94105

JENNER & BLOCK LLP
455 Market Street, Suite 2100
San Francisco, CA 94105

1   (S.D.N.Y. 2015).  And in *Sterk v. Redbox Automated Retail, LLC*, after the Seventh Circuit held

2   that the VPPA did not provide a private right of action to enforce the statute's data retention

3   requirements, on remand, the district court held plaintiffs could not bring a claim under the Stored

4   Communications Act to enforce the VPPA's provision as it would render the VPPA's own private

5   right of action "somewhat superfluous or insignificant."  No. 11 C 1729, 2012 WL 3006674, at *3

6   (N.D. Ill. July 23, 2012).

7          Interpreting the VPPA as extending to live, user-generated video content would jettison the

8   statute's focus on prerecorded video and sweep in a broad swath of previously unregulated video

9   content into the ambit of the statute.  Such content could include video conferencing software that

10   families, schools, businesses, and government institutions now use on a daily basis, and often

11   identifies which users are in a given video conference.  It also would sweep in interactive video

12   games, such as multiplayer online games that notify players their friends also are online and

13   available to play.  The plain text, legislative history, and fundamental principles of statutory

14   construction confirm the VPPA does not reach this type of live video content.

15          Finally, the privacy considerations Congress meant to protect by regulating the disclosure

16   of PII in connection with prerecorded content one watches in their own home support limiting the

17   statute to prerecorded content.  *See* S. Rep. No. 100-599, at 5, *as reprinted in* 1988 U.S.C.C.A.N.

18   at 4342–5 ("It is nobody's business what Oliver North or Robert Bork or Griffin Bell or Pat Leahy

19   watch on television or read or think about when they are home.").  Unlike renting a video, attending

20   a live event is a traditionally public activity.  A person who attends a free live concert at an arena

21   or the county fair does not have any reasonable expectation of privacy in her presence there.  *See*

22   *Katz v. United States*, 389 U.S. 347, 351 (1967) ("What a person knowingly exposes to the public,

23   even in his own home or office, is not a subject of Fourth Amendment protection"); *United States*

24   *v. Norris*, 942 F.3d 902, 907 (9th Cir. 2019) ("[N]o subjective expectation of privacy exists under

25   these circumstances, where information is openly available to third parties.").  An attendee at a

26   public event like a concert or fair sees others and is seen; she can interact with others in real time

27   as the concert progresses or enjoy the fair and share her thoughts with others who are present.

28

JENNER & BLOCK LLP
455 Market Street, Suite 2100
San Francisco, CA 94105

1    The same is true if she were to attend a live event through the Facebook Live product—

2    she could see and be "seen" by name and interact with other viewers in real time as the concert or

3    fair progresses.   There is no functional difference between attending the event in-person and

4    attending a live event on a device but for the addition of a screen.   Plaintiff's claim is the equivalent

5    of going to a concert or fair and expecting no one will see you.

6    **II.    THE VPPA DOES NOT APPLY HERE BECAUSE FACEBOOK IS AN
     INTERACTIVE COMPUTER SERVICE AND DOES NOT RENT, SELL, OR**

7    **DELIVER THE VIDEO CONTENT ON FACEBOOK LIVE.**

8    To state a claim under the VPPA, Plaintiff also must adequately allege that the Facebook

9    Live service qualifies Facebook as a video tape service provider because it is a "person, engaged

10   in the business, in or affecting interstate or foreign commerce, of *rental, sale, or delivery* of

11   prerecorded video cassette tapes or similar audio visual materials."   18 U.S.C. § 2710(a)(4).   He

12   fails to do so.   To the contrary, Facebook Live allows users to share content they create with other

13   registered users.   Therefore, in this case, Facebook is acting as an "interactive computer service,"

14   not as a "video tape service provider."   This distinction is dispositive here.

15   In the traditional VPPA context, brick-and-mortar stores obtained rights to provide video

16   tapes to customers, generally of movies.   They then proceeded to "rent[]" or "sell[]," and in the

17   case of online ordering services, to "deliver[]" the movies to customers.   For example, in *Cappello*

18   *v. Walmart, Inc.*, Walmart was held to be a video tape service provider in relation to its online sale

19   of "DVDs, Blu-ray Discs, video games, and other video media" from its inventory.   No. 18-cv-

20   06678, 2019 WL 11687705, at *1 (N.D. Cal. Apr. 5, 2019).

21   Since movie distribution has moved online, courts have extended the VPPA to what are

22   effectively the successors to traditional brick-and-mortar video tape service providers: online

23   streaming services like Netflix and Hulu, or websites that sell or rent the successors to video

24   tapes—streaming prerecorded movies and other shows—online.   *See Mollett v. Netflix Inc.*, No.

25   11-CV-01629, 2012 WL 3731542, at *2 (N.D. Cal. Aug. 17, 2012), *aff'd*, 795 F.3d 1062 (9th Cir.

26   2015); *Hulu*, 2012 WL 3282960, at *4–6.[9]

27

28   [9] *Vizio* has extended this theory to software on televisions that provide access to Netflix, Hulu, and
     similar programming that other courts have held are covered by the VPPA and involve prerecorded

1   But courts have not gone further.  Indeed, consistent with Congress's intent that the VPPA

2   apply to a narrow set of circumstances, courts have declined to expand the VPPA's narrow scope

3   beyond Congress's original intent "[t]o preserve personal privacy with respect to the rental,

4   purchase or delivery of video tapes or similar audio visual materials."  S. Rep. No. 100-599, at 1,

5   *as reprinted in* 1988 U.S.C.C.A.N. at 4342-1.

6   For example, in *Rodriguez v. Sony Computer Entertainment America, LLC*, the Ninth

7   Circuit held that the VPPA did not provide a private right of action for unlawful retention of PII.

8   801 F.3d 1049, 1049–54 (9th Cir. 2015).  In addition to relying on a careful analysis of the statutory

9   text and structure, the Ninth Circuit recognized that nothing in the legislative history "evince[s]

10   any Congressional intent to create a private right of action for a video service provider's retention

11   of a consumer's personal information."  *Id.* at 1051.

12   Similarly, in *Eichenberger v. ESPN, Inc.*, the Ninth Circuit held that the serial number on

13   a Roku device (together with the plaintiff's viewing history) did not constitute "personally

14   identifiable information" under the VPPA.  876 F.3d 979, 984–86 (9th Cir. 2017).  Although the

15   device serial number in theory allowed sophisticated third parties to identify an individual if

16   combined with other data sets, the Ninth Circuit was "not persuaded that the 1988 Congress

17   intended for the VPPA to cover circumstances so different from the ones that motivated its

18   passage."  *Id.*  Instead, the court concluded that "personally identifiable information" refers to

19   information that readily permits an ordinary person to identify someone as having watched certain

20   videos.  *Id.* (quoting *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 267 (3d Cir. 2016)).

21   Facebook, in contrast, is an "interactive computer service."  The CDA defines that term as

22   any "information service, system, or access software provider that provides or enables computer

23   access by multiple users to a computer server, including specifically a service or system that

24   provides access to the Internet and such systems operated or services offered by libraries or

25   educational institutions."  47 U.S.C. § 230(f)(2).  Courts within the Ninth Circuit and beyond

26   uniformly have agreed Facebook is an interactive computer service under federal law.  *See, e.g.*,

27

28   content.  This rationale has no application to this case, which does not involve facilitating access
to prerecorded content.  *See In re Vizio, Inc., Consumer Priv. Litig.*, 238 F. Supp. 3d at 1221–22.

JENNER & BLOCK LLP
455 Market Street, Suite 2100
San Francisco, CA 94105

1   *Fed. Agency of News LLC v. Facebook, Inc.*, 395 F. Supp. 3d 1295, 1305 (N.D. Cal. 2019);

2   *Igbonwa v. Facebook, Inc.*, No. 18-CV-02027, 2018 WL 4907632, at *5 (N.D. Cal. Oct. 9, 2018),

3   *aff'd*, 786 F. App'x 104 (9th Cir. 2019); *Caraccioli v. Facebook, Inc.*, 167 F. Supp. 3d 1056, 1065

4   (N.D. Cal. 2016), *aff'd*, 700 F. App'x 588 (9th Cir. 2017); *Sikhs for Justice "SFJ", Inc. v.*

5   *Facebook, Inc.*, 144 F. Supp. 3d 1088, 1093 (N.D. Cal. 2015), *aff'd*, 697 F. App'x 526 (9th Cir.

6   2017); *Klayman v. Zuckerberg*, 753 F.3d 1354, 135758 (D.C. Cir. 2014).

7         Congress recognized the distinction between video tape service providers that "deliver"

8   prerecorded video and platforms that serve as a conduit for user-generated content when it passed

9   the Communications Decency Act ("CDA") in 1996—well before the 2013 amendments to the

10  VPPA. Pub. L. 104-104, tit. V, § 509, 110 Stat. 56, 133, 137 *et seq.* (1996) (codified at 47 U.S.C.

11  § 230). The CDA "immunizes providers of interactive computer services against liability arising

12  from content created by third parties." *Gonzalez*, 2 F.4th at 886 (quoting *Fair Housing Council of*

13  *San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1162 (9th Cir. 2008) (en banc)).

14  Congress enacted the CDA "to promote the free exchange of information and ideas over the

15  Internet and to encourage voluntary monitoring for offensive or obscene material" and to

16  encourage the development of "interactive computer services" like Facebook that provide a

17  platform for users to engage with information and ideas—and with each other—over the internet.

18  *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1099–1100 (9th Cir. 2009) (quoting *Carafano v.*

19  *Metrosplash.com, Inc.*, 339 F.3d 1119, 1122 (9th Cir. 2003)); *see* 47 U.S.C. § 230(a)(3).

20        Unlike traditional video tape service providers or their mail order or streaming successors,

21  interactive computer services like Facebook generally do not rent, sell, or deliver content to

22  customers. *See Lemmon v. Snap, Inc.*, 995 F.3d 1085, 1091 (9th Cir. 2021); *Dyroff v. Ultimate*

23  *Software Grp., Inc.*, 934 F.3d 1093, 1097 (9th Cir. 2019) (noting interactive computer service

24  *facilitated* user communication and did not create any of its own content). And Facebook does not

25  rent, sell, or deliver content to customers through the product at issue here—Facebook Live.

26  Instead, Facebook Live gives users the ability to share content they create with other users.

27  Facebook users "deliver" and access the content, not Facebook Live. *See Klayman*, 753 F.3d at

28  1357; *Dyroff*, 934 F.3d at 1097 (interactive computer service "did not create or publish its own

JENNER & BLOCK LLP
455 Market Street, Suite 2100
San Francisco, CA 94105

content"); *cf. In re Hulu Priv. Litig.*, No. C 11-03764, 2014 WL 1724344, at *2 (N.D. Cal. Apr. 28, 2014) ("Hulu pays license fees to studios, networks, and other rights holders to obtain the video content that it offers to its users."); *Robinson v. Disney Online*, 152 F. Supp. 3d 176, 178 (S.D.N.Y. 2015) ("[Plaintiff] downloaded the Disney Channel application, which, once installed on his Roku, allowed him to view Disney's proprietary video content.").

Judge Chhabria's decision in *In re Facebook, Inc., Consumer Privacy User Profile Litigation*, 402 F. Supp. 3d 767 (N.D. Cal. 2019), has no bearing on this case. There, plaintiffs alleged Facebook violated the VPPA by disclosing information about what prerecorded videos users streamed on the Facebook platform to third parties outside of the Facebook platform (*e.g.*, prerecorded Netflix videos), including to certain app developers like Netflix. *Id.* at 779–80. Judge Chhabria concluded he could not decide on a motion to dismiss whether Facebook was a videotape service provider as a matter of law with respect to plaintiffs' allegations that Facebook "maintains a cache of videos and visual materials, including from content providers like Netflix, for their delivery to users." *Id.* at 799. Judge Chhabria's analysis thus focused on whether Facebook was engaged in the business of delivering prerecorded video in connection with its alleged cache of prerecorded videos from third-party content providers to be delivered to Facebook users to stream. *See id.* at 798–99. He had no occasion to decide whether interactive computer services are subject to the VPPA or whether live video content is within the scope of the statute. Plaintiff's allegations here focus exclusively on live, user-generated content shared using the Facebook Live product.

Congress's intent in enacting laws like the CDA was to protect and encourage online services like Facebook in facilitating sharing of user-generated content. Holding that the VPPA covers Facebook Live would undercut the regulatory scheme Congress intended for interactive computer services. It would also represent a dramatic, unjustified expansion of the VPPA. There is no evidence Congress had this kind of user-generated activity in mind when it passed the VPPA in 1988. To the contrary, although Congress was well aware of the rise of online services and the sharing of user-generated content when it revisited the VPPA in 2013, it chose not to update the definition of "video tape service provider" to reach platforms that make this kind of sharing

JENNER & BLOCK LLP
455 Market Street, Suite 2100
San Francisco, CA 94105

1  possible.  *See* S. Rep. No. 112-258, at 1-2 (recognizing that "[t]oday, many Americans post their

2  opinions and recommendations on social networking sites, like Facebook and Twitter").

3      The VPPA remains limited to the narrow purpose for which it was enacted—to regulate

4  providers of prerecorded video cassette tapes and similar audio visual materials.  Meta, in allowing

5  users to broadcast live events to their friends and family through Facebook Live, falls outside of

6  the statute's reach.

7                    **CONCLUSION**

8      Plaintiff's Complaint fails to state a claim against Meta for violation of the VPPA.  The

9  VPPA does not cover live broadcasts.  This alone defeats Plaintiff's only claim.  Meta also does

10  not rent, sell, or deliver content that is subject to the VPPA through Facebook Live.  Facebook

11  Live allows users to share exclusively user-generated content.  Because amendment would be

12  futile, the Complaint should be dismissed with prejudice pursuant to Federal Rule of Civil

13  Procedure 12(b)(6).

14

15  Dated: May 20, 2022           Respectfully submitted,

16                    JENNER & BLOCK LLP

17

18               By:  */s/  Laurie Edelstein*

19                    Laurie Edelstein (Bar No. 164466)
                  Paige Zielinski (Bar No. 318639)

20                    JENNER & BLOCK LLP
                  455 Market Street, Suite 2100

21                    San Francisco, California 94105
                  Telephone:  (628) 267-6800

22                    Facsimile:  (628) 267-6859
                  ledelstein@jenner.com

23                    pzielinski@jenner.com

24                    John Flynn (Bar No. 196294)

25                    JENNER & BLOCK LLP
                  1099 New York Avenue, NW, Suite 900
                  Washington, D.C. 20001

26                    Telephone:  (202) 639-6000

27                    Facsimile:  (202) 639-6066
                  jflynn@jenner.com

28                    *Attorneys for Defendant Meta Platforms, Inc.*

JENNER & BLOCK LLP
455 Market Street, Suite 2100
San Francisco, CA 94105