1  **LYNCH CARPENTER, LLP**
   Todd D. Carpenter
2  1350 Columbia Street, Suite 603
   San Diego, CA 92101
3  Tel:   619-762-1910
   Fax:   412-231-0246
4  todd@lcllp.com

5  *Attorneys for Plaintiff and the Proposed Class*

6  [Additional counsel listed on signature page.]

7

8  UNITED STATES DISTRICT COURT

9  NORTHERN DISTRICT OF CALIFORNIA

10  OAKLAND DIVISION

| | |
|---|---|
| JUSTIN WALKER, Individually and on Behalf of All Others Similarly Situated, | Case Number: 4:22-cv-02442-JST |
| Plaintiff, | **FIRST AMENDED CLASS ACTION COMPLAINT** |
| vs. | **DEMAND FOR JURY TRIAL** |
| META PLATFORMS, INC., | |
| Defendant. | |

Plaintiff Justin Walker, on behalf of himself and all others similarly situated, files this Complaint against Defendant Meta Platforms, Inc. ("Meta" or "Defendant") for violation of the federal Video Privacy Protection Act, 18 U.S.C. § 2710 ("VPPA"). Plaintiff's allegations are based upon personal knowledge with respect to himself and on information and belief derived from, among other things, investigation of counsel and review of public documents as to all other matters:

**I.    NATURE OF THE ACTION**

1.    This is a consumer digital privacy class action complaint against Meta, as the owner and operator of the website Facebook.com and related online application ("Facebook"), for violating the VPPA by disclosing its digital subscribers' personally identifiable information (as defined under the VPPA) without the proper consent.

2. The VPPA prohibits "video tape service providers," such as Meta, from knowingly disclosing consumers' personally identifiable information, including "information which identifies a persona as having requested or obtained specific video materials or services from a video tape provider," without express consent in a stand-alone consent form.

3. On Facebook, Defendant offers the Facebook Live tool whereby it broadcasts consumers' personally identifiable viewing information, including their full names and the specific video materials or services they viewed on the Facebook Live tool such as movies, performances and other virtual events (the "PII"). Through the Facebook Live Tool, Facebook knowingly discloses to other third parties—specifically, other viewers of the Facebook Live Event—its consumers' PII without their consent in violation of the VPPA.

4. Accordingly, Plaintiff brings this class action for legal and equitable remedies to redress and put a stop to Defendant's practices of intentionally disclosing its digital subscribers' Personal Viewing Information to third parties in knowing violation of the VPPA.

**II.    JURISDICTION AND VENUE**

5. This Court has jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) (the "Class Action Fairness Act") because sufficient diversity of citizenship exists between the parties in this action, the aggregate amount in controversy exceeds $5,000,000, exclusive of interests and costs, and there are well in excess of 100 class members. Because it is estimated that the Class (defined below) will have thousands of members and Defendant's violations of the VPPA are punishable by statutory damages of $2,500 per violation, the amount in controversy is well in excess of $5,000,000.

6. The Court has personal jurisdiction over Defendant because it has affirmatively established and maintained contacts with California in that the Defendant is registered to do business in this State, is headquartered in this State, and conducts significant business in this State.

7. Venue is proper under 28 U.S.C. § 1391(b)(1) because Defendant's principal place of business is in this judicial district.

## III. THE PARTIES

8. Plaintiff Justin Walker is an adult domiciled in California. Plaintiff is a Facebook digital subscriber and has been for approximately fifteen (15) years. During the relevant time period he has used the Facebook digital subscription to view video materials through the Facebook Live Tool while logged into his Facebook account. By doing so, Plaintiff's PII was disclosed to unauthorized persons pursuant to the systematic process described herein. Plaintiff never gave Defendant express written consent to disclose his PII.

9. Defendant Meta is a Delaware corporation with its headquarters and principal executive offices in this district at 1601 Willow Road, Menlo Park, California 94025. It is a citizen of Delaware and California. Prior to December 1, 2021, Meta was known as Facebook Inc. It is the owner and operator of, among other things, two large social media platforms, Facebook and Instagram. As detailed below, through Facebook, Defendant delivers and, indeed, is in the business of delivering, countless hours of video materials and/or services to its digital subscribers such that it is a "Video Tape Service Provider" within the meaning of the VPPA.

## IV. FACTUAL ALLEGATIONS

### A. Background of the Video Privacy Protection Act

10. The VPPA generally prohibits the knowing disclosure of a customer's video rental or sale records without the informed, written consent of the customer in a form "distinct and separate from any form setting forth other legal or financial obligations." Under the statute, the Court may award actual damages (but not less than liquidated damages of $2,500.00 per person), punitive damages, equitable relief and attorney's fees.

11. The VPPA was initially passed in 1988 for the explicit purpose of protecting the privacy of individuals' and their families' video rental, purchase and viewing data. Leading up to its enactment, members of the United States Senate warned that "[e]very day Americans are forced to provide to businesses and others personal information without having any control over where that information goes." S. Rep. No. 100-599 at 7-8 (1988).

12. The VPPA entered law as 18 U.S.C. § 2710 as an update to the Stored Internet Communications Act, which covers 18 U.S.C. §§ 2702-10. The Stored Internet Communications Act, in turn, constitutes Title II of the Electronics Communications Privacy Act of 1986, intended to "clarify Federal privacy protections and standards in light of dramatic changes in new computer and telecommunications technologies." S. Rep. 99-541 at 1 (1986).

13. Senators at the time were particularly troubled by disclosures of records that reveal consumers' purchases and rentals of videos and other audiovisual materials. As Senator Patrick Leahy and the late Senator Paul Simon recognized, records of this nature offer "a window into our loves, likes, and dislikes," such that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599 at 7-8 (1988) (statements of Sens. Simon and Leahy, respectively).

14. In proposing the Video and Library Privacy Protection Act (later codified as the VPPA), Senator Leahy stated that "[i]n practical terms our right to privacy protects the choice of movies that we watch with our family in our own homes. And it protects the selection of books that we choose to read." 134 Cong. Rec. S5399 (May 10, 1988). Thus, the personal nature of such information, and the need to protect it from disclosure, is the inspiration of the statute: "These activities are at the core of any definition of personhood. They reveal our likes and dislikes, our interests and our whims. They say a great deal about our dreams and ambitions, our fears and our hopes. They reflect our individuality, and they describe us as people." *Id*.

15. The original authors of the VPPA were eager to embrace an inclusive reading of the act with an eye towards incorporating future technologies. Senator Chuck Grassley stated "[i]t is up to the legislature to define and give meaning to privacy. As our society grows more complex, legislatures should be responsible to new technological threats to privacy." 134 Cong. Rec. S16312-01 (Oct. 14, 1988). Senator Simon also affirmed that the VPPA would safeguard privacy considering future advances of video technology, saying "[n]o doubt in the days and years ahead we will continue to make much progress in developing new technologies. . . . The

Video Privacy Protection Act strikes the necessary balance to ensure that our privacy will not be lost as we move ahead." *Id*.

16. The Congressional record also reveals that the VPPA, while inspired by privacy violations concerning rented video cassettes, was intended to cover additional forms of video content from its inception. The Senate's analysis of the VPPA specifies that "similar audio visual materials" is meant to cover "laserdiscs, open-reel movies, or CDI technology." S. Rep. 100-599 at 12 (1988). In naming competitors to video cassettes in this illustrative list, some of which were cutting-edge technologies not widely used in 1988, the record demonstrates the mission of privacy protection in the face of technological change, not simply increased regulation on purveyors of video cassettes.

17. While these statements rang true in 1988 when the VPPA was passed, the importance of legislation like the VPPA in the modern era of data mining is more pronounced than ever before. During a recent Senate Judiciary Committee meeting, "The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century," Senator Leahy emphasized the point by stating: "While it is true that technology has changed over the years, we must stay faithful to our fundamental right to privacy and freedom. Today, social networking, video streaming, the 'cloud,' mobile apps and other new technologies have revolutionized the availability of Americans' information."[1]

18. In 2013, Congress amended the VPPA to recognize the fast pace of present-day information sharing putting a strain on modern video tape service providers. The 1988 language "requires written consent to disclose information related to video rentals and purchase every time a disclosure it sought." S. Rep. 112-258 at 2-3 (2012). The amendment fixed this issue by providing for "written consent to disclose user information. . . one time in advance" so long as that consent came "in a form distinct and separate from any form setting forth other legal and financial obligations of the consumer." *Id*; 18 U.S.C. § 2710(a)(2). Implicit here is that websites providing streaming video sit squarely at the center of the modern VPPA: "[t]oday. . .

---

[1] The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century, Senate Judiciary Committee Subcommittee on Privacy, Technology and the Law, http://www.judiciary.senate.gov/meetings/the-video-privacy-protection-act-protecting-viewer-privacy-in-the21stcentury.

internet streaming services allow consumers to watch movies or TV shows on televisions, laptop computers, and cell phones." S. Rep. 112-258 at 2 (2012).

19. Speaking in favor of the amendment, House sponsor Rep. Goodlatte suggested that the act was necessary specifically because social media video platforms already fell under the VPPA, stating: "[w]ith today's technology, consumers can quickly and efficiently access video programming through a variety of platforms, including through Internet protocol-based video services, all without leaving their homes…. This bill updates the Video Privacy Protection Act to allow videotape service providers to facilitate sharing on social media networks of the movies watched or recommended by users." 158 Cong Rec. H6849-01 (Dec. 18, 2012).

20. In this case, Defendant chose to deprive Plaintiff and the Class members of their right to privacy by systematically disclosing their PII to third-parties, without providing notice to (let alone obtaining consent from) anyone, as explained herein.

**B.     The Facebook Platform**

21. Defendant's website and application Facebook was launched in 2004 as an online social media and social networking service.

22. Facebook can be accessed from devices with Internet connectivity, such as personal computers, tablets, and smartphones.

23. As a requirement to use and access Facebook, users are required to, and do, register and subscribe to Facebook. As part of this registration process, subscribers are required to provide Facebook with their personal information such as their full name, phone number, email address, date of birth, and gender:

/ / /

/ / /



24. On information and belief, all digital subscribers also provide Defendant with their IP address, which is a unique number assigned to all information technology connected devices, that informs Defendant as to subscribers' city, zip code and physical location.

25. Finally, digital subscribers may provide to Defendant the identifier on their mobile devices and/or cookies stored on their devices.

26. After the registration process is complete, Facebook subscribers are then assigned a unique Facebook ID ("FID"). An FID is a unique and persistent identifier that Facebook assigns to each user. With it, any ordinary person can look up the user's Facebook profile and name.

27. When opening an account, Defendant does not disclose to its digital subscribers that it will share their PII with third parties through its use of the Facebook Live Tool. Digital subscribers are also not asked to consent to such information sharing upon opening an account.

28. After becoming a digital subscriber, viewers have access to a variety of information and tools on the Facebook platform.

29. After registering, users can create a profile revealing information about themselves. They can post text, photos and multimedia which are shared with any other users who have agreed to be their "friend" or publicly. Users can also communicate directly with each other with Facebook Messenger, join common-interest groups, and receive notifications on the activities of their Facebook friends and the pages they follow.

**C.    Facebook Live**

30. In August 2015, Meta (then Facebook) launched Facebook Live, an ad-supported video streaming service designed to compete with other services in the live video industry, such as Twitch and YouTube Live.[2] Meta continues to operate Facebook Live and associated online content delivery services. As the live video industry has grown, Facebook Live also competes directly against subscription supported video streaming services like Netflix or Hulu.[3]

31. Users, pages, and groups can utilize the Facebook Live tool to create live video content, whereby Defendant will deliver the countless hours of video materials or services to its digital subscribers.

32. Meta first encodes and "ingests" video recorded using Facebook Live into Meta's server infrastructure. Meta then caches the video in their servers until a user's device requests the video. Meta's platform then retrieves the cached video from a data center and sends it to the user's internet service provider, which in turn will send it to the user. Meta has developed technology to seamlessly deliver video content to millions of simultaneous users this way and refers to the process of retrieving and broadcasting a video as "delivery fanout."[4]

---

[2] Facebook Goes All in on Live Video. https://www.usatoday.com/story/tech/news/2016/04/06/facebook-adds-features-live-video-push/82680084/

[3] Facebook Says Social Video Watching Will Set Them Apart from Netflix and YouTube. https://www.cnbc.com/2018/09/02/facebook-says-social-video-will-set-it-apart-from-netflix-and-youtube.html

[4] How We Scale Live Streaming for Millions of Viewers Simultaneously: https://engineering.fb.com/2020/10/22/video-engineering/live-streaming/

33. Further, with respect to some Facebook Live broadcasts, Meta processes the live video into a recording after the broadcast ends and continues to store the entirety of the video on its servers unless users specifically delete them.[5] In addition, Meta records and saves all comments and redactions made during the live video, which users can seamlessly replay alongside the video at any time. Meta will continue to make live videos and associated comments available for delivery months or years after the initial broadcast.

34. Meta also provides a suite of tools for content creators who wish to take advantage of the Facebook Live platform without the risk of a live broadcast. Specifically, Facebook Premiere allows users, pages, or groups to debut a prerecorded video as if it were a live video.[6] Although viewers see the same interface as a typical live video, and can still comment and react as if live, they will be watching entirely prerecorded content.

35. As Defendant acknowledges, through the Facebook Live tool Defendant will deliver broadcasts of users' "conversation[s], performance[s]…or virtual event[s]."

36. Users, pages, and groups hold Live Events for various purposes and cover an endless number of topics, from politics, makeup, and pop-culture to more serious and private issues, such as fertility preservation and HIV. Creators of live videos range from individuals recording from their phones to large companies creating professionally produced content for commercial purposes. Meta places no restrictions on the content, length, or frequency of live videos other than stipulating those broadcasts must comply with the Facebook terms of service.

37. Facebook Live serves as a profit center for Meta, and for the content creators who use Facebook Live and its various associated programs to deliver content to audiences. Meta offers an array of monetization and advertising options for live video, which produces revenue for Meta and content creators, who are in turn incentivized to continue streaming live video through Meta's delivery platform.

---

[5] What to do After Your Facebook Live Broadcast Ends. https://meetedgar.com/blog/what-you-should-do-after-your-facebook-live-broadcast-ends/

[6] Premiere Videos from Creator Studio. https://www.facebook.com/business/learn/lessons/premiere-videos-from-creator-studio

38. The most basic advertising option Meta offers on live video is "boosting." After a stream goes live, users can pay Meta a fee, and in exchange Meta will deliver the user's live video to a defined set of viewers to whom Meta would otherwise likely not deliver said video content.[7]

39. Meta also offers users the ability to enable "in-stream" ads, which interrupt live video delivery in the same way a television commercial does. There are three distinct categories: pre-stream ads that run before a viewer can access their requested content, mid-stream ads that will briefly interrupt content during delivery, and image ads that will superimpose a static billboard image over the video during delivery.[8] While enabling these ads is optional, Meta splits the revenue from these advertisements with the broadcasting user, incentivizing users to monetize their content through this option.

40. Advertising is Meta's near exclusive source of revenue. In 2021, Meta derived over 97% of revenue from advertising, and Meta's 66% revenue growth since 2019 is almost entirely attributable to growth in advertising revenue.[9]

41. Far from being a social tool dedicated exclusively to sharing between friends, Facebook Live has become a commercial behemoth that is an attractive option for large content producing companies to deliver content to audiences. For example, Facebook served as a broadcast outlet for the 2020 UEFA Champions League Final soccer match, delivering the game to 7.2 million viewers, while also delivering the advertisements that came along with it.[10]

42. Meta actively recruits content and content creators to Facebook Live, not only competing to provide better service than live streaming rivals, but also bidding for exclusive rights to deliver their content. The result is a robust ecosystem of transactions and partnerships that support Facebook Live in competing for live video market share.

---

[7] Boost a Live Video from Ads Manager. https://www.facebook.com/business/help/268170920933673?id=603833089963720

[8] About Facebook In-Stream Ads for Live Videos. https://www.facebook.com/business/help/414537652868820?id=1200580480150259

[9] Meta Reports Fourth Quarter and Full Year 2021 Results. https://s21.q4cdn.com/399680738/files/doc_financials/2021/q4/FB-12.31.2021-Exhibit-99.1-Final.pdf

[10] Low Latency Streaming Speeds Things Up. https://switchboard.live/blog/low-latency-streaming/

43. Some of this content is traditionally entertainment broadcast on television. In 2018, Meta paid $30 million for the exclusive rights to broadcast 25 Major League Baseball games on Facebook Live.[11] The broadcasts, which featured prominent Facebook and Facebook Live branding, serve as one example of the financial commitment Meta makes to supporting the Facebook Live ecosystem. Meta remains active in bidding for exclusive rights to broadcast live sports content.

44. Video game livestreaming, and the influencers who host video game streams, are the most lucrative and fastest growing market in live video. In 2021, viewers watched over 33 billion hours of video game streams worldwide across all major platforms, with most of those hours on ad-supported platforms like Facebook Live.[12] Furthermore, 2021 saw 21% growth in watch hours year-over-year, and more rapid growth is likely as live streaming becomes central to modern entertainment.[13]

45. Meta brands their participation in this market as Facebook Gaming, which allows users on Facebook to utilize the Facebook Live infrastructure to stream video games.[14] These streams often capitalize on the advertising options Meta provides for live video to monetize content, and many popular streamers have product-placement or endorsement deals with video game related companies outside of Meta's advertising infrastructure.

46. Facebook Gaming accounted for 5.3 billion watch hours in 2021, a 47% increase in watch hours from 2020.[15] Video game content is likely to be one of the fastest growing sectors of Facebook Live, and one of Meta's fastest growing sources of ad-revenue.

47. Meta maintains a "Facebook Gaming Partnership" program, in which video game streamers can officially affiliate with Meta.[16] Streamers whom Meta accepts into this

---

[11] Facebook-MLB Streaming Partnership Seen as Business Success, Despite Backlash. https://www.sportingnews.com/us/mlb/news/facebook-watch-mlb-live-broadcast-exclusive-deal/wmcivoi9va4515msmaoosmwkw

[12] Report Reveals Major Game Streaming Growth and Trends in 2021. https://hitmarker.net/news/game-streaming-growth-trends-2021-1985103

[13] Id.

[14] Facebook Gaming. https://www.facebook.com/gaming/

[15] State of the Stream – 2021 Year in Review. https://blog.streamelements.com/state-of-the-stream-2021-year-in-review-4a7074439829

selective program will receive technical help, access to monetization consultants, and exclusive monetization options.[17] Meta will also promote these streamers to viewers on their various video delivery platforms. The goal of this program is to encourage popular video game streamers to choose Facebook Live as a delivery platform, further strengthening the Facebook Gaming ecosystem.

48. Meta also maintains a less rigorous program for newer creators streaming video games on Facebook called "Level Up."[18] This auxiliary program in the Facebook Live ecosystem provides participants with verification and exclusive access to support and monetization options, but also requires creators to stream a certain amount of content over Facebook Live on a regular basis to continue participation.

49. Meta has occasionally bid on the most popular streamers to obtain exclusive rights to their content for the Facebook Live ecosystem. Notably, the popular video game streamer known as "Disguised Toast" claimed that Meta offered him a contract thirty-times the size of his then-current contract with Twitch in a deal that made Facebook Live the exclusive delivery platform for his content.[19]

50. Live streaming content is also central to the concept of the "Metaverse," which is currently the central focus of Meta's future business development plans. Delivery of live content that permits users to interact in real time with broadcasters allows individuals to move their social and public lives more completely into the online sphere, which Meta envisions occurring through their platforms.[20]

51. Not only does Meta's live video delivery service compete with other services in the industry, it also competes with video on-demand streaming services. As watch hours for live content increase, younger users are increasingly abandoning traditional video on-demand

---

[16] The Facebook Gaming Partnership. https://www.facebook.com/business/help/2478459059124998

[17] Join the Facebook Gaming Partner Program. https://www.facebook.com/fbgaminghome/creators/partner-program

[18] Join Level Up. https://www.facebook.com/fbgaminghome/creators/levelup

[19] Disguised Toast Leaves Facebook Gaming. https://thebusinessofesports.com/2021/12/08/disguised-toast-leaves-facebook-gaming/

[20] Livestreaming the Metaverse. https://www.gmw3.com/2022/02/livestreaming-the-metaverse/

media, putting Facebook Live in direct competition for views and clicks with Netflix and Hulu.[21]

52. When a Facebook subscriber watches video materials or services during a Live Event, Facebook identifies the subscriber by name and displays to the subscriber which of his Facebook "friends" (also subscribers) are also watching the Live Event. Facebook simultaneously notifies the subscriber's "friends" that the subscriber is viewing the Live Event.

53. As shown in the screenshot below, Facebook displays a list of the subscriber's Facebook friends who are watching the same live video, and tags them as "viewers":



---

[21] Can Streaming Video Survive the Metaverse? https://fortune.com/2022/03/29/streaming-tv-movies-metaverse-entertainment-industry/

54. The above screenshot was taken from a Facebook Live Event. Notably, Facebook notified the host (another Facebook subscriber) that three of his "friends" are watching the live video, **identifying them by their private names and surnames** (their Facebook usernames). These Facebook friends could see each others' viewing status as well.

55. Importantly, Facebook did not notify any of these subscribers that by joining the Facebook Live event, the specific video materials or services they requested from Facebook would be shared with third parties.

56. Nowhere on Defendant's Privacy pages, Terms of Service, nor anywhere on its website or application does Defendant inform its subscribers that it will identify them by name in conjunction with sharing information about which specific video materials or services they are viewing with other third parties.

57. Defendant also fails to obtain subscribers' consent (written or otherwise) to share this private viewing information with others.

58. Similarly, Defendant also fails to obtain digital subscribers' written consent to share the specific video materials or services they are viewing "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer," as the VPPA requires.

**D.    Plaintiff's Experiences**

59. Plaintiff Justin Walker has been a digital subscriber of Facebook for approximately fifteen (15) years. Plaintiff became a digital subscriber of Facebook by providing, among other information, his name, phone number, email address, date of birth, gender, IP address (which informs Defendant as to the city and zip code he resides in as well as his physical location), and any cookies associated with his device. In turn, Defendant gave Plaintiff a unique FID for his Facebook account.

60. Since approximately 2017, Plaintiff has utilized Defendant's Facebook Live tool to request specific video materials or services from Defendant's Facebook platform.

61. Plaintiff believes he requests specific video materials or services from Defendant's Facebook platform utilizing the Facebook Live tool approximately 3-5 times per week.

62. Plaintiff has never consented, agreed, authorized, or otherwise permitted Defendant to disclose specific video materials or services he requests from Defendant through the Facebook Live tool to third-parties. Plaintiff has never been provided any written notice that Defendant discloses specific video materials or services requested by its digital subscribers through the Facebook Live tool to third parties, or any means of opting out of such disclosures. Defendant nonetheless knowingly disclosed specific video materials or services requested by Plaintiff to unauthorized third parties.

63. Because Plaintiff is entitled by law to privacy in his PII, Defendant's disclosure of his PII to unauthorized third parties without his informed, written consent that is in a form distinct and separate from form setting forth other legal or financial obligations, deprived Plaintiff of his statutory rights under the VPPA.

## V.  CLASS ACTION ALLEGATIONS

64. Plaintiff brings this action on behalf of the following proposed class (the "Class") under Federal Rule of Civil Procedure 23, seeking damages and equitable relief on behalf of the following Class, defined as follows:

> All persons in the United States with a digital subscription to Facebook that utilized the Facebook Live tool and had their PII disclosed to third parties in connection therewith.

65. Subject to additional information obtained through further investigation and discovery, the foregoing definition of the Class may be expanded or narrowed by amendment or amended complaint.

66. Excluded from the Class are Defendant, their past or current officers, directors, affiliates, legal representatives, predecessors, successors, assigns and any entity in which any of them have a controlling interest, as well as all judicial officers assigned to this case and their immediate families.

67. <u>Numerosity</u>. Members of the Class are so numerous and geographically dispersed that joinder of all members of the Class is impracticable. Plaintiff believes that there are hundreds of thousands of members of the Class widely dispersed throughout the United States. Class members can be identified from Defendant's records and non-party Facebook's records.

68. <u>Typicality</u>. Plaintiff's claims are typical of the claims of members of the Class. Plaintiff and members of the Class were harmed by the same wrongful conduct by Defendant in that Defendant caused Personal Viewing Information to be disclosed to Facebook without obtaining express written consent. His claims are based on the same legal theories as the claims of other Class members.

69. <u>Adequacy</u>. Plaintiff will fairly and adequately protect and represent the interests of the members of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the members of the Class. Plaintiff is represented by counsel with experience in the prosecution of class action litigation generally and in the emerging field of digital privacy litigation specifically.

70. <u>Commonality</u>. Questions of law and fact common to the members of the Class predominate over questions that may affect only individual members of the Class because Defendant has acted on grounds generally applicable to the Class. Such generally applicable conduct is inherent in Defendant's wrongful conduct. Questions of law and fact common to the Class include:

(a) Whether Defendant knowingly disclosed Class members' PII to third parties through the Facebook Live tool;

(b) Whether the information disclosed to third parties through the Facebook Live tool concerning Class members' PII constitutes personally identifiable information under the VPPA;

(c) Whether Defendant's disclosure of Class members' PII to third parties through the Facebook Live tool was knowing under the VPPA;

      (d)      Whether Class members consented to Defendant's disclosure of their PII to third parties through the Facebook Live tool in the manner required by 18 U.S.C. § 2710(b)(2)(B); and

      (e)      Whether the Class is entitled to damages as a result of Defendant's conduct.

71.    <u>Superiority</u>. Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action. Plaintiff knows of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

## VI.   CLAIM FOR RELIEF

**<u>FIRST CLAIM FOR RELIEF</u>**

**(Violation of the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710)**

72.    Plaintiff incorporates the preceding paragraphs by reference as if fully set forth herein.

73.    The VPPA prohibits a "video tape service provider" from knowingly disclosing "personally-identifying information" concerning any consumer to a third-party without the "informed, written consent (including through an electronic means using the Internet) of the consumer." 18 U.S.C § 2710.

74.    As defined in 18 U.S.C. § 2710(a)(4), a "video tape service provider" is "any person, engaged in the business, in or affecting interstate commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audiovisual materials."

75. Defendant is a "video tape service provider" as defined in 18 U.S.C. § 2710(a)(4) because it engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio-visual materials.

76. As defined in 18 U.S.C. § 2710(a)(3), "personally-identifiable information" is defined to include "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."

77. Defendant knowingly caused PII concerning Plaintiff and Class members to be disclosed to third parties through the Facebook Live tool. This information constitutes personally identifiable information under 18 U.S.C. § 2710(a)(3) because it identified each Plaintiff and Class member to third-party users of the Facebook Live tool by disclosing their full names and the specific video materials or services they requested from the platform.

78. As defined in 18 U.S.C. § 2710(a)(1), a "consumer" means "any renter, purchaser, or subscriber of goods or services from a video tape service provider." As alleged in the preceding paragraphs, Plaintiff and Class Members subscribed to the Facebook platform. Plaintiff is thus a "consumer" under this definition.

79. As set forth in 18 U.S.C. § 27109(b)(2)(B), "informed, written consent" must be (1) in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer; and (2) at the election of the consumer, is either given at the time the disclosure is sought or given in advance for a set period of time not to exceed two years or until consent is withdrawn by the consumer, whichever is sooner." Defendant failed to obtain informed, written consent under this definition.

80. In addition, the VPPA creates an opt-out right for consumers in 18 U.S.C. § 2710(2)(B)(iii). It requires video tape service providers to also "provide[] an opportunity for the consumer to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the consumer's election." Defendant failed to provide an opportunity to opt out as required by the VPPA.

81. Defendant knew that these disclosures identified Plaintiff and Class members to third-party users of the Facebook Live tool. Defendant also knew that Plaintiff's and Class

1   members' PII was disclosed to third parties because, *inter alia*, Defendant advertises as much on the Facebook website. *See* https://www.facebook.com/formedia/tools/facebook-live.

82. By disclosing Plaintiff's and the Class's PII, Defendant violated Plaintiff's and the Class members' statutorily protected right to privacy in their video-watching habits. *See* 18 U.S.C. § 2710(c).

83. As a result of the above violations, Defendant is liable to the Plaintiff and other Class members for actual damages related to their loss of privacy in an amount to be determined at trial or alternatively for "liquidated damages not less than $2,500 per plaintiff." Under the statute, Defendant is also liable for reasonable attorney's fees, and other litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by the Defendant in the future.

## VII. RELIEF REQUESTED

84. Accordingly, Plaintiff, on behalf of himself and the proposed Class, respectfully requests that this Court:

    (a) Determine that this action may be maintained as a class action and direct that reasonable notice of this action be given to the Class, and declare Plaintiff as the representative of the Class;

    (b) For an order declaring that Defendant's conduct as described herein violates the federal VPPA, 18 U.S.C. § 2710(c)(2)(D);

    (c) For Defendant to pay $2,500.00 to Plaintiff and each Class member, as provided by the VPPA, 18 U.S.C. § 2710(c)(2)(A);

    (d) For punitive damages, as warranted, in an amount to be determined at trial, 18 U.S.C. § 2710(c)(2)(B);

    (e) For prejudgment interest on all amounts awarded;

    (f) For an order of restitution and all other forms of equitable monetary relief;

    (g) For injunctive relief as pleaded or as the Court may deem proper; and

(h) For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit, 18 U.S.C. § 2710(c)(2)(C).

## VIII. JURY DEMAND

85. Plaintiff, on behalf of himself and the proposed Class, demands a trial by jury on all issues so triable.

Respectfully submitted,

Dated: June 10, 2022

**LYNCH CARPENTER, LLP**

By: */s/ Todd D. Carpenter*
Todd D. Carpenter (SBN 234464)
todd@lcllp.com
1350 Columbia St., Ste. 603
San Diego, California 92101
Tel.:   (619) 762-1900
Fax:   (619) 756-6991

Alex R. Straus (SBN 321366)
astraus@milberg.com
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
280 S. Beverly Drive
Beverly Hills, CA  90212
Tel:   (917) 471-1894
Fax:   (865) 522-0049

Gary M. Klinger (admitted *pro hac vice*)
gklinger@milberg.com
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, Illinois 60606
Tel.:   866.252.0878

Katrina Carroll*
katrina@lcllp.com
**LYNCH CARPENTER, LLP**
111 W. Washington Street, Suite 1240
Chicago, Illinois 60602
Tel:   (312) 750-1265

Jonathan M. Jagher*
jjagher@fklmlaw.com
**FREED KANNER LONDON & MILLEN LLC**
923 Fayette Street
Conshohocken, Pennsylvania 19428
Tel:   (610) 234-6487
Fax:   (224) 632-4521

*Pro Hac Vice* Applications Forthcoming

*Attorneys for Plaintiff and the Proposed Class*

20
FIRST AMENDED CLASS ACTION COMPLAINT