UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JUSTIN WALKER,

              Plaintiff,

     v.

META PLATFORMS, INC.,

              Defendant.

Case No. 22-cv-02442-JST

**ORDER GRANTING MOTION TO DISMISS**

Re: ECF No. 27

Before the Court is a motion to dismiss brought by Defendant Meta Platforms, Inc. ("Meta"). ECF No. 27. Plaintiff Justin Walker opposes the motion. For the reasons set forth below, the Court will grant the motion, with leave to amend.

I.      **BACKGROUND**

The following are allegations in the First Amended Class Action Complaint ("FAC"), which is the operative complaint.[1] *See* ECF No. 23. The Court accepts these allegations as true for the purpose of resolving the present motion to dismiss.

Meta is the owner and operator of Facebook, a social media platform that can be accessed on devices such as personal computers, tablets, and smartphones using the internet. *Id.* ¶¶ 1, 9, 22. Meta requires a person seeking to use Facebook to first subscribe to Facebook. *Id.* ¶ 23. The subscription process requires providing Facebook with personal information, including full name, phone number, email address, date of birth, and gender. *Id.* Once registered, a Facebook subscriber can access tools on the Facebook platform, including Facebook Live. *Id.* ¶¶ 28, 30.

---

[1] Plaintiff filed the FAC, ECF No. 23, in lieu of filing a response to Meta's motion to dismiss the original iteration of the complaint, ECF No. 13. The Court terminated as moot Meta's motion to dismiss the original iteration of the complaint after Plaintiff filed the FAC. *See* ECF No. 24.

United States District Court
Northern District of California

United States District Court
Northern District of California

Facebook Live, which Meta launched in 2015, is a "live video delivery service," *id.* ¶ 51, that is supported by advertisements and is "designed to compete with other services in the live video industry, such as Twitch and YouTube Live," *id.* ¶ 30.  Facebook Live's delivery of live video involves Meta "[l]ive streaming content" from broadcasters to other Facebook subscribers who wish to view the video content in a manner that "permits users [viewing the content] to interact in real time with broadcasters[.]"  *Id.* ¶ 50; *see also id.* ¶¶ 31-32 & n.4.  To live stream video content via Facebook Live, Meta "ingests" into its servers the live video content that is being broadcast by the creator of the content; it caches the video content in its servers; and it then transmits the video content to the Facebook subscribers who request to view it.  *Id.* ¶ 32 & n.4.

"Facebook Live Events" are live video broadcasts on Facebook Live.  *See id.* ¶¶ 3, 52-55.  When a Facebook subscriber watches a Facebook Live Event, Facebook notifies the viewer's Facebook "friends" (who are also Facebook subscribers) that the viewer, who is identified by name, is "watching the live video."  *Id.* ¶¶ 52-54.  Facebook Live also displays to the viewer the names of his or her Facebook "friends" who are also "watching the same live video."  *Id.* ¶ 53.  Meta does not notify Facebook subscribers that, by viewing a Facebook Live Event, their names and the specific live video content they requested to view will be shared with other Facebook subscribers who also watch the same Facebook Live Event.  *See id.* ¶ 55.  Meta also does not obtain Facebook subscribers' consent before disclosing their names and video-watching behavior on Facebook Live to other Facebook subscribers who watch the same Facebook Live Events.  *Id.* ¶¶ 57-58.

Meta makes money from Facebook Live based on paid advertisements and fees that Meta collects from Facebook subscribers who use Facebook Live to broadcast live video content.  *See id.* ¶¶ 37-40.  Walker alleges that, "[f]ar from being a social tool dedicated exclusively to sharing between friends, Facebook Live has become a commercial behemoth that is an attractive option for large content[-]producing companies to deliver content to audiences."  *Id.* ¶ 41.  Some of this content would traditionally be broadcast on television.  *Id.* ¶ 43.  For example, in 2018, Meta paid $30 million for the exclusive rights to broadcast 25 Major League Baseball games on Facebook Live.  *Id.*  Facebook Live also is used for "[v]ideo game livestreaming[.]"  *Id.* ¶ 44.  Meta also

1    actively recruits "content and content creators to Facebook Live" and bids for exclusive rights to

2    deliver their content.  *Id.* ¶ 42.

3          Walker alleges that Facebook subscribers can access two types of prerecorded video

4    content on Facebook, but Walker does not allege that either of the two types of prerecorded video

5    content can be accessed via Facebook Live, or that Meta discloses the names of viewers of the

6    prerecorded video content to the viewers' "friends" (or to any other third party) as it allegedly

7    does when Facebook subscribers view Facebook Live Events.

8          The first type of prerecorded video content can be accessed by using Facebook Premiere

9    (hereinafter, "the Facebook Premiere recordings").  Facebook Premiere is a "tool[]" that "allows

10   users, pages, or groups to debut a prerecorded video as if it were a live video."  *Id.* ¶ 34.  Viewers

11   of prerecorded videos that are "debut[ed]" via Facebook Premiere "see the same interface as a

12   typical live video, and can still comment and react as if live," even though they are "watching

13   entirely prerecorded content."  *Id.*  Walker does not allege that Meta discloses information to any

14   person that could identify the video-watching behavior of viewers of Facebook Premiere

15   recordings.

16         The second type of prerecorded video content is comprised of recordings of Facebook Live

17   Events that Facebook users can replay after a Facebook Live Event has ended (hereinafter, "the

18   Facebook Live replays").  Meta allegedly converts some of the live video content that is live

19   streamed via Facebook Live "into a recording" after the live broadcast ends, and the recording is

20   retained by Meta indefinitely unless the Facebook subscriber who broadcast the live video content

21   deletes the recording.  *Id.* ¶ 33.  When Meta creates a recording in this manner, Meta also records

22   all comments and reactions by Facebook subscribers who watched the live broadcast on Facebook

23   Live.  *Id.*  These recordings of live-streamed Facebook Live video content and associated

24   Facebook subscriber comments and reactions may be replayed by Facebook subscribers months or

25   years after the initial live broadcast on Facebook Live.  *Id.*  Walker does not allege that Facebook

26   subscribers can replay these recordings through Facebook Live, such that the replays constitute

27   Facebook Live Events during which the names of the viewers of the replays are disclosed to other

28   Facebook subscribers who are also watching the replays.  Walker does not allege that Meta

United States District Court
Northern District of California

3

otherwise discloses information to any person that could identify the video-watching behavior of viewers of the Facebook Live replays.

Plaintiff Justin Walker has been a subscriber of Facebook for approximately fifteen years. *Id.* ¶ 59. He provided Meta his name, phone number, email address, IP address, and other identifying information when he became a Facebook subscriber. *Id.* Since 2017, Walker has utilized Facebook Live to request "specific video materials or services" via Facebook Live approximately three to five times per week. *Id.* ¶¶ 60-61. Meta allegedly disclosed, without his consent and in violation of the Video Privacy Protection Act ("VPPA"), his name and specific video material he requested on Facebook Live to "unauthorized third parties," *id.* ¶ 62, who were "other viewers of the Facebook Live Event[s]" he accessed via Facebook Live, *see id.* ¶ 3.

Walker asserts a single claim against Meta for violations of the VPPA on his own behalf and on behalf of a proposed class comprised of "[a]ll persons in the United States with a digital subscription to Facebook that utilized the Facebook Live tool and had their PII [their names and the specific video materials they watched on Facebook Live] disclosed to third parties in connection therewith." *Id.* ¶ 64. Walker seeks remedies that include an order declaring that Meta violated the VPPA; $2,500 in statutory liquidated damages for himself and each proposed class member; punitive damages; and an award of reasonable attorney's fees and costs.

Meta now moves under Federal Rule of Civil Procedure 12(b)(6) to dismiss Walker's claim under the VPPA.

## II.  JURISDICTION

The Court has subject matter jurisdiction under 28 U.S.C. § 1331.

## III.  LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain sufficient factual matter that, when accepted as true, states a claim that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* While this standard is not a probability requirement, "[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the

United States District Court
Northern District of California

4

1    line between possibility and plausibility of entitlement to relief." *Id.* (internal quotation marks and

2    citation omitted).  In determining whether a plaintiff has met this plausibility standard, the Court

3    must "accept all factual allegations in the complaint as true and construe the pleadings in the light

4    most favorable" to the plaintiff.  *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005).

5    **IV.    DISCUSSION**

6            "The VPPA was enacted in 1988 in response to the Washington City Paper's publication

7    of then-Supreme Court nominee Robert Bork's video rental history."  *Mollett v. Netflix, Inc.*, 795

8    F.3d 1062, 1065 (9th Cir. 2015) (citing S. Rep. 100-599 at 5 (1988), *reprinted in* 1988

9    U.S.C.C.A.N. 4342-1).  "The paper had obtained (without Judge Bork's knowledge or consent) a

10   list of the 146 films that the Bork family had rented from a Washington, D.C.-area video store."

11   *Id.*  "Members of the Judiciary Committee 'denounced the disclosure' and Congress acted swiftly

12   to enact the VPPA."  *Id.* (quoting S. Rep. 100–599 at 1).  "According to the Senate Report on the

13   VPPA, Congress's purpose when enacting the statute was '[t]o preserve personal privacy with

14   respect to the rental, purchase or delivery of video tapes or similar audio visual materials.'"  *Id.*

15   (quoting S. Rep. 100-599 at 1).

16           The "VPPA identifies a substantive right to privacy that suffers any time a video service

17   provider discloses otherwise private information."  *Eichenberger v. ESPN, Inc.*, 876 F.3d 979,

18   983-84 (9th Cir. 2017).  The VPPA prohibits a "video tape service provider" from knowingly

19   disclosing "personally identifiable information" about any of its consumers "to any person,"

20   subject to some exceptions for permissible disclosures.  *See* 18 U.S.C. § 2710(b)(1).  The

21   exceptions to the Act's disclosure prohibition, which are set forth in § 2710(b)(2), include those

22   that permit "disclosure of a consumer's video rental history to the consumer himself, or to third

23   parties when the consumer has provided written consent or the third party has obtained a warrant

24   or court order."  *Mollett*, 795 F.3d at 1066 (citing 18 U.S.C. § 2710(b)(2)).  If a video tape service

25   provider discloses personally identifiable information of a consumer in violation of § 2710(b)(1),

26   the aggrieved consumer may bring a civil action for remedies that include "liquidated damages in

27   an amount of $2,500," punitive damages, and reasonable attorney's fees and costs.  *See* 18 U.S.C.

28   § 2710(c).

United States District Court
Northern District of California

5

1

2

3

4

5

6

7

8

9

10

11

United States District Court
Northern District of California

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

"[T]o plead a plausible claim under section 2710(b)(1), a plaintiff must allege that (1) a defendant is a 'video tape service provider,' (2) the defendant disclosed 'personally identifiable information concerning any customer' to 'any person,' (3) the disclosure was made knowingly, and (4) the disclosure was not authorized by section 2710(b)(2)." *Mollett*, 795 F.3d at 1066.

Meta moves to dismiss Walker's VPPA claim, arguing that Walker has not alleged facts to satisfy the first two elements of a claim under § 2710(b)(1). Specifically, Meta argues that Walker has not plausibly pleaded (1) that Meta is a "video tape service provider" in connection with Facebook Live; or (2) that Meta disclosed his "personally identifiable information" to any other person in connection with Facebook Live.[2]

### A.      Whether Meta is a "video tape service provider" in connection with Facebook Live

The VPPA provides that a person or entity is a "video tape service provider" if either of the following two conditions is met: (1) the person or entity is "engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials," or (2) the person or entity received a disclosure of a consumer's personally identifying information from a video tape service provider under specific circumstances described in §§ 2710(b)(2)(D)[3] and 2710(b)(2)(E)[4] of the VPPA. *See* 18 U.S.C. § 2710(a)(4).

---

[2] Because Meta does not make any arguments in its motion to dismiss with respect to the third and fourth elements of a claim under § 2710(b)(1), namely those requiring that the disclosure of the consumer's personally identifiable information was made knowingly and that the disclosure was not authorized by § 2710(b)(2), the Court does not examine for the purpose of resolving Meta's motion whether Walker's allegations are sufficient to plead those elements.

[3] Subparagraph (D) of 18 U.S.C. § 2710(b)(2) permits the disclosure by a video tape service provider of a consumer's name and address to any person, but not information identifying the title, description, or subject matter of the audio visual materials the consumer viewed, so long as the consumer was provided with the opportunity to prohibit such disclosure.

[4] Subparagraph (E) of 18 U.S.C. § 2710(b)(2) permits the disclosure by a video tape service provider of a consumer's personally identifiable information to any person if the disclosure is incident to the ordinary course of business of the video tape service provider.

United States District Court
Northern District of California

1  Here, Walker does not allege that Meta is a video tape service provider on the basis that it

2  received disclosures of his personally identifying information from another video tape service

3  provider.[5] *See generally* ECF No. 23.  At issue, therefore, is whether Walker has plausibly alleged

4  that Meta is a videotape tape service provider on the basis that Meta "engaged in the business, in

5  or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video

6  cassette tapes or similar audio visual materials."  *See* 18 U.S.C. § 2710(a)(4).

7  Meta argues that Walker has not done so because the video content that Walker allegedly

8  accessed via Facebook Live does not fall within the scope of "similar audio visual materials."[6]

9  Meta contends that Facebook Live enables Facebook subscribers to broadcast live video content to

10  other subscribers in real time, as the video content is generated, and such live broadcasts fall

11  outside of the scope of "similar audio and visual materials."  Meta argues that, for video content to

12  fall within the scope of "similar audio and visual materials," it must be "prerecorded" video

13  content, because "similar" must be read in conjunction with the preceding phrase, "prerecorded

14  video cassette tapes."  Meta argues that, for an audio and visual material to be "similar" to

15  "prerecorded video cassette tapes," the audio and visual material must itself be "prerecorded."

16  Meta contends that an interpretation of "similar audio and visual materials" that does not restrict

17  its scope to "prerecorded" audio and visual materials would fail to give meaning to, and would

18  render superfluous, the word "prerecorded" in "prerecorded video cassette tapes."

19  The Ninth Circuit has not defined "similar audio visual materials" or otherwise examined

20  the question of whether the delivery of "live" video content (i.e., video content that is broadcast at

21  ―――――――――――

22  [5] In his opposition, Walker argues that Meta is a video tape service provider because it received,
   from an unidentified source, "information about the video content Plaintiff and other Facebook

23  Live users requested and obtained while using Facebook Live."  ECF No. 33 at 16-17.  This
   argument is irrelevant to the resolution of the present motion because the FAC contains no

24  allegations that Meta received "personally identifying information" about Walker (or any other
   Facebook subscriber) from a *video tape service provider*, which is what the VPPA requires.  *See*

25  18 U.S.C. § 2710(a)(4).

26  [6] Meta also argues that it is not a video tape service provider because Walker has not plausibly
   alleged that Meta is engaged in the "delivery" of live video content in connection with Facebook

27  Live under 18 U.S.C. § 2710(a)(4).  The Court does not reach this argument because Walker's
   VPPA claim as to live video content on Facebook Live fails on the basis that such content does

28  not fall within the scope of "similar audio visual materials."

the same time that it is being generated or produced), whether online or otherwise, is covered under the VPPA.

Since at least 2012, lower courts have construed "similar audio visual materials" to include *pre-recorded* video content streamed over the internet on the ground that the legislative history of the VPPA indicates that "Congress was concerned with protecting the confidentiality of private information about viewing preferences regardless of the business model or media format involved" and intended to cover new formats for delivering "pre-recorded video content." *See In re Hulu Priv. Litig.*, No. C 11-03764 LB, 2012 WL 3282960, at *6 (N.D. Cal. Aug. 10, 2012) (Beeler, J.). Lower courts have uniformly declined to interpret "similar audio visual materials" as covering "live" video content broadcast over the internet. For example, in *Louth v. NFL Enterprises LLC*, No. 1:21-cv-00405-MSM-PAS, 2022 WL 4130866, at *4 (D.R.I. Sept. 12, 2022), the defendant allegedly delivered "live game content" over the internet, as well as "prerecorded game highlights and other videos," to consumers' devices via an app. The defendant moved to dismiss the plaintiff's VPPA claim to the extent that it was premised on the defendant's delivery of "live" game content, arguing that it could not be deemed to be a "video tape service provider" with respect to "live" game content. *Id.* The plaintiff argued that "live content" fell within the scope of "similar audio visual materials," but the court rejected that argument, reasoning that "this interpretation [of the VPPA] goes too far." *Id.* The court held:

> The adjective "prerecorded" modifies both "video cassette tapes" and "similar audio visual materials." This is confirmed in a Sen[a]te Report recommending passage of the VPPA, specifically identifying "laser discs, open-reel movies, and CDI technologies," as the types of technologies that provide "similar audio visual materials," beyond video cassette tapes.

*Id.* (citing S. Rep. No. 100-599 at 5). Based on that interpretation of the VPPA, the court dismissed the plaintiff's VPPA claim to the extent that it was premised on the defendant's alleged online delivery of "live content." *Id.* at 5. The court held that the plaintiff's VPPA claim was not subject to dismissal to the extent that it was premised on the defendant's alleged delivery of "pre-recorded content." *Id.*

1    Other courts similarly have distinguished prerecorded video content from live video

2    content, holding that only the former type falls within the scope of "similar audio visual

3    materials."  *See Stark v. Patreon, Inc.*, __ F. Supp. 3d__, No. 22-CV-03131-JCS, 2022 WL

4    7652166, at *6 (N.D. Cal. Oct. 13, 2022) (Spero, J.) (adopting the reasoning in *Louth* and holding

5    that "a video must be prerecorded to fall within the VPPA's definition of 'similar audio visual

6    materials,'" and dismissing VPPA claim for failure to allege that the video content at issue was

7    prerecorded); *Czarnionka v. Epoch Times Ass'n, Inc.*, No. 22 CIV. 6348 (AKH), 2022 WL

8    17069810, at *4 (S.D.N.Y. Nov. 17, 2022) (relying on *Louth* and *Stark* and holding that "Plaintiff

9    has plausibly alleged that the VPPA applies to the video content he consumed" because the

10   allegations in the complaint raise the inference that "Plaintiff consumed prerecorded content"

11   available on the defendant's website).[7]

12   Walker has cited no case in which a court has held that a live broadcast of video content,

13   whether streamed over the internet or otherwise, falls within the scope of "similar audio visual

14   materials" such that a person or entity that delivers it can be deemed to be a "video tape service

15   provider" under the VPPA.  The opinions to which Walker points do not support the proposition

16   that "similar audio visual materials" can be construed as including live video content, because the

17   video content at issue in those cases was not alleged to have been live video content.  *See In re*

18   *Facebook, Inc., Consumer Priv. User Profile Litig.*, 402 F. Supp. 3d 767, 798 (N.D. Cal. 2019)

19   (denying motion to dismiss VPPA claim in relevant part because the plaintiffs plausibly alleged

20   that Facebook was a "video tape service provider" in the context of videos that Facebook

21   delivered to its users through its website, where the video content at issue was not alleged to have

22   been broadcast live); *In re Hulu*, 2012 WL 3282960, at *6 (similar); *Ambrose v. Bos. Globe Media*

23   *Partners LLC*, No. CV 21-10810-RGS, 2022 WL 4329373, at *2 (D. Mass. Sept. 19, 2022)

24   (similar); *Lebakken v. WebMD, LLC*, __F. Supp. 3d__, No. 1:22-CV-644-TWT, 2022 WL

25

26   [7] *Louth*, *Stark*, and *Czarnioka* were issued after the briefing on the present motion had been
     completed.  Defendant notified the Court of the issuance of *Louth* and *Stark* via a Statement of
27   Recent Decision, *see* ECF No. 37, and Plaintiff did the same with respect to *Czarnioka*, *see* ECF
     No. 40.
28

United States District Court
Northern District of California

1    16716151, at *3 & n.2 (N.D. Ga. Nov. 4, 2022) (similar); *Belozerov v. Gannett Co.*, __F. Supp.

2    3d__, No. CV 22-10838-NMG, 2022 WL 17832185, at *3 (D. Mass. Dec. 20, 2022) (similar)[8]; *In*

3    *re Vizio, Inc., Consumer Priv. Litig.*, 238 F. Supp. 3d 1204, 1221 (C.D. Cal. 2017) (holding that

4    maker and seller of smart TVs was a video tape service provider because the smart TVs' apps

5    enabled consumers to "access Netflix, Hulu, YouTube, and Amazon Instant Video content in their

6    homes," where the video content at issue was not alleged to have been broadcast live).

7            The Court is persuaded by the reasoning of the *Louth* and *Stark* courts and adopts it here to

8    conclude that "similar audio visual materials" must be read in a manner that gives meaning to, and

9    that does not render superfluous, the word "prerecorded" in the preceding phrase, namely

10   "prerecorded video cassette tapes."  *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is a

11   cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed

12   that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or

13   insignificant.") (citation and internal quotation marks omitted).  To give meaning to

14   "prerecorded," the scope of "similar audio visual materials" must be limited to audio visual

15   materials that are "prerecorded."  As the *Stark* court noted, interpreting "similar audio visual

16   materials" in that manner is consistent with the plain text of the VPPA, because "broadcast, cable,

17   and satellite television were all well established at the time of the VPPA's passage[,]" yet "there is

18   nothing in the statute's language suggesting that providers of such live broadcasts fall within its

19   scope."  2022 WL 7652166, at *6.  That interpretation also is supported by the legislative history

20   of the VPPA.  The 1988 Senate Report recommending passage of the VPPA identified examples

21   of materials that fall within the scope of "similar audio visual materials" (i.e., "laser discs, open-

22   reel movies, and CDI technologies"), but none of the examples are materials that would permit, or

23   that otherwise are associated with, the live transmission of video content.  *See* S. Rep. No. 100-

24   599 at 5.  "It is also notable that while broadcast, cable, and satellite television were all well

25

26   _____

27   [8] *Ambrose*, *Lebakken*, and *Belozerov*, discussed above, were issued after the briefing on the
     present motion had been completed.  Plaintiff alerted the Court of their issuance by filing
28   Statements of Recent Decision.  *See* ECF Nos. 38, 39, 41.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    established at the time of the VPPA's passage, there is nothing in the statute's language suggesting

2    that providers of such live broadcasts fall within its scope." *Stark*, 2022 WL 7652166, at *6.

3    Here, the only type of video content that Walker alleges to have accessed is that which he,

4    as a Facebook subscriber, "requested" via Facebook Live. ECF No. 23 ¶ 58. The only type of

5    video content that Walker identifies in the FAC as being accessible to Facebook subscribers via

6    Facebook Live is "live video content," which Walker alleges is live streamed in real time, as it is

7    being generated. *Id.* ¶¶ 30-32 & n.4; 50. Because live video content does not fall within the scope

8    of "similar audio visual materials," Walker's VPPA claim is not cognizable, and it is

9    DISMISSED, to the extent that it is premised on the live video content that he allegedly accessed

10   via Facebook Live.

11   Walker's arguments are unconvincing. He contends that live streamed video content on

12   Facebook Live counts as "prerecorded" and, therefore, falls within the scope of "similar audio

13   visual materials." ECF No. 33 at 13. Walker argues that "Meriam-Webster dictionary defines

14   'prerecorded' as something 'recorded in advance,'" and Facebook Live content fits that definition

15   because the technical process that Meta employs to live stream video involves "taking data input

16   from users, writing that data onto its physical servers, reading that data, and only then delivering

17   that data to end users." *See id.* Walker contends that the fact that this technical process results in

18   the transmission of video content on a near-contemporaneous basis relative to its production does

19   not change the fact that the process involves the "recording" of the video data on Meta's servers

20   and the "rebroadcasting" of the recorded video data to viewers via Facebook Live.

21   The Court is not persuaded. Even under Walker's proposed definition of "prerecorded"

22   (i.e., "recorded in advance"), live streamed video content would not qualify as prerecorded.

23   Walker's allegations raise the inference that, during a Facebook Live broadcast, the video content

24   is broken down into pieces, which are recorded onto Meta's servers and then transmitted to the

25   viewer in a continuous stream that results in the viewer being able to view the video content at the

26   same time or nearly at the same time as it is being generated. *See* ECF No. 23 ¶¶ 31-32 & n.4.

27   "Recording" the video content on Meta's servers *in the course of* transmitting the content is not

28   the same as "*pre*recording" the video content, *in advance* of its transmission. Further, it appears

1    that at least some forms of broadcasting live television may employ a technical process for

2    transmitting the video content that is analogous to the process that Meta allegedly employs for

3    transmitting live video content via Facebook Live, yet Walker has cited no case in which a court

4    has held that live television broadcasts count as "prerecorded" or are otherwise covered under the

5    VPPA.  Accordingly, the Court declines to interpret "prerecorded" and the VPPA in the manner

6    that Walker proposes.

7        Walker also argues that Meta is a "video tape service provider" because Meta allegedly

8    allows Facebook subscribers to access video content that was recorded prior to its dissemination to

9    Facebook subscribers.  *See* ECF No. 33 at 14.  Walker points to his allegations regarding the

10   Facebook Premiere recordings and Facebook Live replays.  *See id.*  As noted above, Facebook

11   Premiere recordings are videos recorded in advance of their dissemination to Facebook subscribers

12   via Facebook Premiere; when these prerecorded videos are displayed to viewers, the videos appear

13   as if they are being broadcast live.  *See* ECF No. 23 ¶ 34.  Facebook Live replays are recordings

14   that Meta creates of certain live broadcasts on Facebook Live, which Facebook subscribers can

15   access *after* the live broadcasts on Facebook Live have ended.  *See id.* ¶ 33.

16       When construing Walker's allegations in the light most favorable to him, as the Court must

17   at this stage, they raise the inference that Facebook Premiere recordings and Facebook Live

18   replays involve video content that is "prerecorded" and thus falls within the scope of "similar

19   audio visual materials."  However, Walker's VPPA claim, to the extent that it is premised on these

20   two types of prerecorded video content, is nevertheless subject to dismissal for a different reason.

21   As discussed below, Walker's allegations do not raise the inference that Meta disclosed personally

22   identifying information that could reveal his video-watching behavior with respect to Facebook

23   Premiere recordings or Facebook Live replays.

24       **B.    Whether Meta disclosed Walker's "personally identifying information"**

25       The second element of a claim under § 2710(b)(1) requires that the plaintiff allege that "the

26   defendant disclosed personally identifiable information" concerning him or her to "any person."

27   *Mollett*, 795 F.3d at 1066 (citation and internal quotation marks omitted).  The term "personally

28   identifying information" "includes information which identifies a person as having requested or

1    obtained specific video materials or services from a video tape service provider[.]"  18 U.S.C.

2    § 2710(a)(3).  The Ninth Circuit has interpreted this definition as including "information that

3    would readily permit an ordinary person to identify a specific individual's video-watching

4    behavior."  *Eichenberger*, 876 F.3d at 985 (citation and internal quotation marks omitted).

5         Meta argues that Walker has not plausibly pleaded facts to satisfy this element because the

6    only disclosures of his personally identifying information that he avers in the FAC pertain to his

7    alleged consumption of Facebook Live video content.  Meta contends that, because live broadcasts

8    on Facebook Live are not covered as "similar audio visual materials" under the VPPA, any

9    disclosures of Walker's personally identifying information in connection with his consumption of

10   such live broadcasts are not actionable under the VPPA.  Meta further contends that Walker's

11   allegations regarding Facebook Premiere recordings and Facebook Live replays are insufficient to

12   plausibly aver that Meta disclosed his personally identifying information with respect to that

13   prerecorded video content, because Walker has not alleged that he requested or accessed any

14   Facebook Premiere recordings or Facebook Live replays and that Meta disclosed any information

15   to any other person that identified him as having requested Facebook Premiere recordings or

16   Facebook Live replays.

17        Meta's arguments are well-taken.  Walker does not aver that he used any Facebook tool or

18   product, other than Facebook Live, to access video content.  *See* ECF No. 23 ¶¶ 60-62.  Facebook

19   Live, according to the FAC, is limited to "live video content," *see, e.g.*, *id.* ¶¶ 51, 30-32, 52-55,

20   which is not covered under the VPPA for the reasons discussed above.  Accordingly, Meta's

21   alleged disclosures of information to other Facebook users that could identify Walker's video-

22   watching behavior with respect to Facebook Live video content, *see, e.g.*, *id.* ¶¶ 60-61, 52-58, 3,

23   are not actionable under the VPPA.

24        Walker alleges that Meta makes accessible to Facebook subscribers prerecorded video

25   content in the form of Facebook Premiere recordings and Facebook Live replays, but he does not

26   allege that he requested or accessed any such prerecorded content or that Meta disclosed any

27   information to another person that could reveal his video-watching behavior with respect to that

28

1    prerecorded content.  Accordingly, Walker's VPPA claim, to the extent that it is predicated on

2    Facebook Premiere recordings and Facebook Live replays, is DISMISSED on that basis.

3              Walker's arguments that his VPPA claim is not subject to dismissal are unavailing.  He

4    argues that the Court may infer that he accessed Facebook Premiere prerecorded content because

5    he was not able to discern whether any of the video content he requested was Facebook Premiere

6    prerecorded content as opposed to live content.  ECF No. 33 at 14.  Walker contends that

7    Facebook subscribers are not capable of distinguishing whether the video content they accessed

8    via Facebook Premiere is prerecorded or live because Facebook Premiere displays prerecorded

9    video as if it were being broadcast live, and because viewers of Facebook Premiere prerecorded

10   content are able to "interact" with the prerecorded content in the same manner that they would be

11   able to interact with live video content.  *Id.*  This argument misses the point.  That Walker may

12   have confused prerecorded video content with live video content says nothing about whether Meta

13   allegedly disclosed information that could reveal his video-watching behavior with respect to

14   Facebook Premiere recordings, which is the relevant inquiry under the second element for a claim

15   under § 2710(b)(1) (to the extent that his VPPA claim is premised on Facebook Premiere

16   recordings).  Walker does not allege, for example, that Meta displays the names of viewers of

17   Facebook Premiere recordings to other Facebook subscribers who view the same recordings, as it

18   allegedly does during Facebook Live broadcasts.

19             Walker also contends that Meta discloses during Facebook Live replays "the comments

20   and reactions made by the original viewers" of the Facebook Live Event as it was broadcast live.

21   ECF No. 33 at 18.  Walker argues that, "[b]y disclosing those comments and reactions, Meta

22   knowingly discloses the persons who requested and obtained those specific Facebook Live video

23   materials from Meta."  *Id.*  This argument also fails.  Walker alleges no facts suggesting that he

24   made comments or reactions during a live broadcast on Facebook Live that Meta recorded, and

25   that, as a result of such comments or reactions, he could be identified as having viewed that live

26   broadcast by other Facebook subscribers who view a replay of that recording.  Even if the FAC

27   alleged those facts, however, they would not save Walker's claim from dismissal because any

28   alleged disclosure by Meta of information that could reveal that Walker watched live broadcasts

United States District Court
Northern District of California

14

on Facebook Live would not give rise to a claim under the VPPA, as live broadcasts are not covered under the VPPA as "similar audio visual materials," for the reasons discussed above.

In light of the foregoing, the Court GRANTS Meta's motion to dismiss Walker's VPPA claim.  The dismissal is with LEAVE TO AMEND to the extent that the claim is premised on prerecorded video content that Walker allegedly accessed.  The dismissal is WITHOUT LEAVE TO AMEND to the extent that the claim is predicated on live video content that Walker allegedly accessed, because live video content does not fall within the scope of "similar audio visual materials" under the VPPA, for the reasons discussed above, and that defect cannot be cured by amendment.  *See Reddy v. Litton Indus., Inc.*, 912 F.2d 291, 296 (9th Cir. 1990) ("It is not an abuse of discretion to deny leave to amend when any proposed amendment would be futile."); *see also Yocom v. Foss*, No. 19-CV-02949-JST, 2022 WL 19314, at *2 (N.D. Cal. Jan. 3, 2022) (dismissing claim without leave to amend because "amendment would be futile") (citing *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000)).

## V.	CONCLUSION

For the reasons set forth above, the Court GRANTS Meta's motion to dismiss Walker's VPPA claim, WITH PARTIAL LEAVE TO AMEND, as set forth above.  To the extent that Walker can do so without contradicting the allegations in the FAC, Walker may file an amended complaint within thirty days of the date this order solely to cure the deficiencies identified herein.

A case management conference will be held on May 23, 2023, at 2:00 p.m.

**IT IS SO ORDERED.**

Dated:  March 3, 2023

JON S. TIGAR
United States District Judge